Taylor MAYES, Appellant,

v.

UNITED STATES, Appellee.

Samuel David GRAVES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CM–686, 93–CM–700.

District of Columbia Court of Appeals.

Argued Sept. 8, 1994.

Decided Feb. 6, 1995.

■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

———

M. Azhar Khan, for appellant Taylor Mayes.

Jeffrey M. Lewis, for appellant Samuel David Graves.

D. Shane Read, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Asst. U.S. Atty., were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Appellants Taylor Mayes and Samuel David Graves entered pleas of guilty to misdemeanor charges of carrying a pistol without a license (CPWOL), in violation of D.C.Code § 22–3204(a) (1989). Each appellant reserved the right to appeal from his conviction on the ground that the trial judge had erred in denying his pretrial motion to suppress tangible evidence. On appeal, each contends that the police seized him without the requisite articulable suspicion of criminal activity. We reverse Mayes' conviction and remand his case to the trial court with directions to grant his motion to suppress. We affirm Graves' conviction.

## I.

### THE EVIDENCE

A. *The Arrests.*

Sergeant Walter Ferguson and Officer Elise Morrison Schofield of the Metropolitan Police Department (MPD), the government's principal witnesses, both testified at the suppression hearing that, on November 23, 1991, the two of them were on patrol in a scout car in the area of 14th and A Streets in northeast Washington, D.C. At some time between midnight and 1:00 a.m., they observed a brown, dark gold, or brown and gold station wagon with tinted windows turn into the 1400 block of northeast A Street. The driver

stopped in front of 1429 A Street, N.E. and double-parked. The vehicle's headlights were on and the motor was running.

Sergeant Ferguson testified that, upon seeing the station wagon, Officer Schofield advised him that the vehicle matched the description of one which was said to have been used in a shooting or a homicide on the previous night. Sergeant Ferguson pulled up his scout car behind the station wagon. He and Officer Schofield both stepped out of the police vehicle and approached the double-parked car. Approximately one minute had elapsed from the time the officers had first observed the station wagon moving into the block.

Sergeant Ferguson went to the driver's side of the station wagon. The rear door on that side "popped open," activating the interior dome light. Observing that there were three men in the back seat,[1] Ferguson directed the individual who was seated behind the driver, and who was later identified as appellant Mayes, to step out of the car. After Mayes had complied with this directive, Ferguson told him to place his hands on the car and then patted him down. Sergeant Ferguson felt a bulge, suspected that Mayes was armed, and directed Officer Morrison to call for back-up. Upon the arrival of reinforcements, Ferguson extracted a .25 caliber semi-automatic pistol from Mayes' pocket.

The remaining occupants of the vehicle were immediately "asked" to get out of the station wagon (according to Sergeant Ferguson) or "pulled" out of it (according to Officer Schofield). The police then searched the car. Officer Schofield found an additional handgun in the back of the vehicle, and another officer recovered a third handgun from the person of one of the men, who was later identified as Samuel Graves. All five men were placed under arrest.

B. *The Alleged Traffic Violation.*

Both Sergeant Ferguson and Officer Schofield claimed that their actions *vis-a-vis* the station wagon and its occupants were undertaken, in part, because the vehicle was involved in a traffic violation. Sergeant Fergu-

---

1. The officers subsequently observed that two other men were sitting in the front of the car.

son stated that the station wagon was "parked abreast," conduct which, according to Ferguson, was a violation of the D.C. Code. He claimed that he was authorized to write a ticket for a vehicle so parked even if the motor was running. Ferguson acknowledged that the double parking had not caused any noticeable traffic problem.

Officer Schofield initially testified that the station wagon "was not allowing cars to drive straight through." She later acknowledged, however, that one lane was free, and that traffic therefore was not "absolutely" blocked.[2] According to Officer Schofield, Sergeant Ferguson "had the intent to make a traffic stop, and he obviously was attempting a traffic stop," although "I would not have stopped them maybe for that reason."

### C. The Wanted Station Wagon.

Officer Schofield testified that earlier that day, some time between 3 p.m. and 11 p.m., she and Officer Suzette Rice observed a station wagon, gold or tan in color, with blacked out windows and "temporary" license tags, traveling past Eastern High School.[3] Officer Schofield got only a "glimpse" of the vehicle, and she and Officer Rice were unable to obtain its tag number. She testified that Officer Rice told her that the station wagon which the two of them observed fit the description of one which had allegedly been used the previous night in a shooting. Later, when Officer Schofield saw the station wagon in which Mayes and Graves were riding, she believed that it was the same vehicle which she and Officer Rice had seen at Eastern High School.

Officer Suzette Rice estimated that she and Officer Schofield first saw the station wagon at 17th and East Capitol Streets at about 11:30 p.m., or perhaps even after midnight. She thought the vehicle was "wanted for a shooting" because she remembered a lookout for a "gold, older model station wagon with tinted windows and temporary tags." She had learned of this lookout "either [at]

roll call or from another officer." With respect to the time at which she heard the lookout, Officer Rice stated that

I can't remember if it was the day before. It was within a couple of days of some shooting that we had in the District.

She acknowledged that her recollection, both of the source and of the information, was "vague."

Sergeant Ferguson testified that station wagons with tinted windows and paper tags are known by the police as "war wagons" or as "battle buckets." Officer Schofield stated that such vehicles are commonly used for "drive-by" shootings. She explained that she "maybe" would not have stopped the car for a traffic infraction, but rather "for being a war wagon" which fit the description in a lookout "for a car wanted for questioning in a shooting."

Sergeant Ferguson testified that the 1400 block of A Street, N.E. was in a "high crime" area. He described 1429 A Street, N.E. (the building in front of which the station wagon was double-parked) as a notorious crack house. A criminal investigator, who was called as a defense witness, testified that the building was in fact a high-rent luxury apartment house with its own security fence. The investigator also took photographs and obtained a brochure about the building; these items were introduced into evidence. The investigator stated that, according to the property manager, there had been no crime problems at the complex in the past four years "other than maybe a domestic situation or what have you." Most of the residents of the building were professional people and, according to the investigator, the premises and grounds were well maintained.

Officer Schofield, as we have previously noted, testified that the lookout on which she was relying was for a station wagon with temporary or paper license tags. Sergeant Ferguson and Officer Schofield both testified during the government's presentation of its case-in-chief that the double-parked station

---

**2.** Officer Schofield first described A Street as a two-way street, then as a one-way street, and finally switched back again. She also placed the events in question in the 1700 block of A Street, N.E., rather than in the 1400 block.

**3.** Eastern High School is located at 17th and East Capitol Street.

■■■■■■■■■

wagon had temporary tags. When the defendants presented their case, however, the parties stipulated that temporary license tags have five-digit numbers and that these numbers are preceded either by one or by two letters. According to. a proffer which the government made to the court shortly after Mayes and Graves were arrested, the tag on the station wagon in which they were riding had six digits, and the parties stipulated that it was a hard, *i.e.*, permanent, license plate and not a temporary tag.

## II.

### THE TRIAL JUDGE'S RULING

The trial judge orally denied each appellant's motion to suppress. First, he found that the car was "parked abreast" and that "there could have been an infraction given" had the officers chosen to ticket the car. Second, he concluded that "this was more than simply a traffic stop because of the information that Officer [Schofield] had about a car with this type of description being involved in the recent shooting or homicide...." The judge indicated, however, that

> [i]f that was the only information that they were relying on I think I would have trouble finding they could approach the car at that point because there is some—the source of that information, I don't think it's been established all the way back to where the police got the information, I think the best that has been established is that Officer Rice either received it in roll call or in a lookout from some official police source but [there is] no information as to how the police actually received that information, whether it was something that they investigated or something that they received a complaint about or what have you.

The judge also ruled that the officers were justified in directing Mayes to step out of the car and in patting him down. The judge stated that he found parts of Sergeant Ferguson's testimony "troubling," and he specifi-

cally rejected Ferguson's claim that 1429 A Street, N.E., was a crack house.[4] Nevertheless, the judge credited the testimony that the general area was a high crime area, largely because Officer Schofield had corroborated Ferguson's testimony in this regard. For that reason, and because the station wagon had tinted windows and was said to have resembled a vehicle which had allegedly been involved in a shooting, the judge concluded that the officers were legitimately concerned about their safety, and that the pat-down of Mayes was therefore proper. The judge held that, once a handgun had been recovered from Mayes' person, the officers had the right to search the car. Accordingly, the judge denied the motions to suppress.[5]

Mayes and Graves then entered conditional pleas of guilty. In return, the government dismissed the charges against the three other occupants of the vehicle. These appeals followed.

## III.

### LEGAL DISCUSSION

#### A. Mayes' Appeal.

The government's defense in this court of the trial court's order is based on two separate propositions or, more accurately, on some combination of the two. First, according to the government, the police had the authority to detain the station wagon and its occupants on the basis of a traffic violation. Second, the detention and frisk were reasonable under the circumstances because of the information Officer Schofield had received about the possible connection of the vehicle, which resembled a "war wagon" or "battle bucket," with a recent shooting.

(1) Articulable suspicion.

■■■ It is undisputed that, having both been ordered out of the car and "frisked," Mayes was "seized," as that term is used in

---

4. The judge commented that Ferguson was either mistaken "or he wasn't being credible about that, or telling the truth about that, because I think the record clearly established that there's no crack house at that location...."

5. A third defendant, Timothy Shon James, had also moved to suppress evidence, and he participated through counsel in the motions hearing.

the Fourth Amendment. *Gomez v. United States*, 597 A.2d 884, 888 (D.C.1991). The prosecution was thus required to prove by a preponderance of the evidence that both the stop and the frisk were constitutionally permissible. *See United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988 n. 14, 996, 39 L.Ed.2d 242 (1974).

▪▪▪ In order to justify a stop or other comparable detention, the police must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cauthen v. United States*, 592 A.2d 1021, 1022 (D.C.1991) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981)). This requirement is not an onerous one. *Gomez, supra*, 597 A.2d at 888–89 (citations omitted). Nevertheless, "[r]easonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). Whether a stop, or a detention equivalent to a stop, is justified requires consideration of the totality of the circumstances. *See, e.g., In re D.E.W.*, 612 A.2d 194, 195 (D.C.1992).

▪▪▪ "[W]hether it is proper to make a protective search incident to a stopping for investigation is a question separate from the issue ... whether it is permissible to stop the suspect; not all stops call for a frisk." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 9.4(a), at 505 (2d ed. 1987). A frisk is an additional and more intrusive seizure, which is warranted only if the officer "has reason to believe that he is dealing with an armed and dangerous individual...." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1882–83, 20 L.Ed.2d 889 (1968). If such reason to believe exists, a frisk is permissible regardless of whether the officer has probable cause to arrest the individual. *Id.; see also Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979) (officer "may conduct a pat-down to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted"). "A [limited] search for weapons in the absence of probable cause to

arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 25–26, 88 S.Ct. at 1882 (citation omitted).

(2) Scope of review.

In *Brown v. United States*, 590 A.2d 1008 (D.C.1991), we stated that

[w]hether reasonable suspicion or probable cause exists to justify a seizure is a mixed question of fact and law. The findings with respect to the historical facts are reviewed under the clearly erroneous standard; the ultimate conclusion, however, is subject to *de novo* review.

*Id.* at 1020 (quoting *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988)). In this case, there is little if any dispute as to the trial judge's findings regarding the historical facts. Here, as in *Brown*, legal issues predominate. *Id.* (citation omitted).

(3) The traffic stop.

The judge sustained the seizure of Mayes, in part, upon the ground that there may have been a traffic infraction, but he did not identify the specific provision which the driver of the vehicle allegedly violated. The District's applicable traffic regulation provides that

[a] person shall stand or park a vehicle on a two-way street with the right hand wheels of the vehicle within twelve inches ... of the right curb....

18 DCMR § 2400.2 (1987); *see also id.* § 2400.3 (similar rule applies to one-way street). It is further provided, however, that

[i]f no curb space is available within a reasonable distance, a passenger vehicle may stand parallel and as near as practicable to other parked vehicles, only long enough to take on passengers who are actually waiting at the curb or to leave off passengers.

*Id.* § 2401.1; *see also id.* §§ 2401.2, 2401.3 (loading and unloading).

▪▪▪ In the present case, the officers had observed the station wagon driven to the spot at which it was "double-parked." They approached the car no more than a minute or so after they first saw it. The vehicle's motor was running, its headlights were on,

and one of its rear doors opened before Sergeant Ferguson arrived. The car, in other words, was double-parked for a very short time, and it appears that a passenger seated in the rear may have been about to alight, as permitted by § 2401.2. It is questionable, to say the least, whether there was any violation of the traffic regulations at all.[6]

But even if we assume, for the sake of argument, that the officers had some reason to believe—an "articulable suspicion"—that there had been a traffic infraction, we are of the opinion that a suspicion of this kind of a very minor violation, standing alone, could not support the frisk of Mayes. If there was an infraction, it was by the driver, and the maximum punishment was a $20.00 civil fine. 18 DCMR § 2601.1 (1987). There was no evidence that Mayes had personally broken the law.

We recognize that an order to exit a vehicle, when directed to someone as to whom articulable suspicion exists, is "a very minor intrusion indeed." *King v. United States*, 550 A.2d 348, 357 (D.C.1988); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333–34, 54 L.Ed.2d 331 (1977). Moreover, "a significant percentage of murders of police officers occurs when the officers are making traffic stops." *United States v. Robinson*, 414 U.S. 218, 234 n. 5, 94 S.Ct. 467, 476 n. 5, 38 L.Ed.2d 427 (1973); *see also Mimms*, 434 U.S. at 110, 98 S.Ct. at 333–34. Indeed, the Supreme Court held in *Mimms* that, once a legitimate stop has been made, an officer may order the driver to exit the car, for "[w]hat is at most a mere inconvenience cannot prevail when balanced

against legitimate concerns for the officer's safety." *Id.* at 111,[7] 98 S.Ct. at 333–34

But proportionality is the key to reasonableness in Fourth Amendment jurisprudence. A seizure must be "reasonably related in scope to the justification for [its] initiation." *Terry, supra,* 392 U.S. at 29, 88 S.Ct. at 1883 (citing *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1651–52, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring)). Drivers commonly, and with impunity, pull up their cars abreast of parked vehicles and stop briefly to load or unload passengers or property. We cannot agree with the position that, whenever this occurs, the police may order passengers out of the car and then frisk them for weapons, all on the basis of an especially brief and slight alleged infraction on the part of the driver, and where there are no additional facts warranting a focus of suspicion on the passenger. To sustain such a contention, in our view, would impermissibly curtail Fourth Amendment protections, and would heighten the potential for pretextual intrusions into the liberty of the citizen. *See, e.g., Minnick v. United States,* 607 A.2d 519, 522 n. 6 (D.C.1992); *Alvarez v. United States,* 576 A.2d 713, 717 & n. 7 (D.C.), *cert. denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990).

We do not suggest that the officers were precluded from approaching the driver in relation to his alleged traffic infraction. We are prepared to assume, solely for the sake of argument, that they could ticket him. If they elected to do so, however, this did not carry with it any accompanying right to frisk passengers. *See Gomez, supra,* 597 A.2d at 890–91; *see also Terry, supra,* 392 U.S. at 32, 88 S.Ct. at 1885 (Harlan, J., concurring).[8]

6. In his brief, Graves "concedes, as he must, that the approach made by the officers was initially based on their observation that the car was parked abreast in violation of D.C. traffic regulations. The officers were entitled to make such a traffic stop...." Mayes does not mention the issue at all. This court, concerned that appellants' explicit or implied concessions may have been improvident and inconsistent with the traffic regulations, issued an order in advance of oral argument directing counsel to be ready to address the issue. At argument, counsel sought to retreat from their respective concessions.

7. The government once again asks us to hold broadly that the logic of *Mimms* applies in all

cases to passengers as well as to drivers. *See Cousart v. United States,* 618 A.2d 96, 99 & n. 5 (D.C.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993); *cf. Thomas v. United States,* 553 A.2d 1206, 1207 n. 7 (D.C.1989). As in *Cousart,* we decline the government's invitation to announce sweeping rules that go well beyond the necessities of the case before us. *See Mims v. Mims,* 635 A.2d 320, 325 n. 12 (D.C.1993).

8. We explained in *Gomez* that

if the officer lacked articulable suspicion to seize Gomez, the seizure could not be justified upon the notion that it would be dangerous to

The frisk of Mayes cannot be sustained on the basis of the alleged traffic violation, standing alone.

### (4) The wanted station wagon.

We now turn to the question whether the actions of the police were legitimized by the report of the possible involvement of the station wagon in an earlier shooting or homicide. We begin by noting the following commendable acknowledgment by the government in its brief in this court:

> It is unclear whether the trial court in the present case was presented with enough evidence to justify the officers' reliance on the tip.

The government makes this concession because, in the words of the brief-writer, "[t]here was no evidence to speak of regarding the source's basis of knowledge or reliability." [9]

The record fully justifies the government's candor. By the time the report on a wanted station wagon had reached Sergeant Ferguson, it was at least "fifth hand" information.[10] Ferguson learned of the lookout from Officer Schofield, who had been told about it by Officer Rice. Officer Rice did not recall where she heard about the wanted station wagon, but she believed that she was told about it either at roll call or by another officer whose identity she did not recall. The unidentified individual who served as Officer Rice's source must have obtained the information from someone, but there is nothing in the record which would shed any light whatever on that person's identity, reliability, or basis of knowledge.

Moreover, the connection between the double-parked station wagon and the "wanted" car was tenuous to say the least. Officer Schofield had only a glimpse of the vehicle which she and Officer Rice observed near Eastern High School. Although the station wagon which the two women observed allegedly resembled a vehicle involved in a shooting or homicide, Officers Rice and Schofield did not contemporaneously report their sighting of it. The double-parked vehicle was spotted by the police late at night, under circumstances in which it must have been difficult for Officer Schofield to distinguish one such station wagon from another.

According to Officer Rice, the lookout was for a vehicle with temporary tags. Sergeant Ferguson testified that he was especially suspicious when he saw the double-parked station wagon because it had paper tags and because "war wagons" used in drive-by shootings usually have such tags. In fact, it was established in the trial court that the vehicle in question had permanent tags. Sergeant Ferguson also apparently believed that police were looking for a "late model" car, but he testified that "late model" means "older." If the words "late model" are accorded their ordinary meaning, then the lookout was for a recently manufactured vehicle. The car in which Mayes was apprehended, on the other hand, was an old contraption and, according to Ferguson, was very much the worse for wear.

Under these circumstances, we are compelled to conclude that the information available to the police regarding the "wanted"

---

chat with Gomez and his companions without restricting their liberty. No matter how appealing the cart may be, the horse must precede it.
597 A.2d at 891. Cf. *Peay v. United States*, 597 A.2d 1318, 1322–23 (D.C.1991) (en banc), in which this court held that an officer's safety is a relevant consideration in determining the propriety of a seizure. In *Peay*, however, the encounter took place in a hallway, and the suspect was clutching an object which potentially resembled a weapon. The officer therefore could not have alleviated the danger to himself by simply walking away.

9. The brief-writer also recognizes, somewhat wryly, that "the government did not provide an

extraordinary amount of detail regarding the tip. . . ."

10. The record in this case reflects how information changes (and often becomes more favorable to the narrator) as it is passed on from one person to the next. Officer Rice was not sure when she had first been apprised of the lookout; her recollection was "vague," but she thought she spotted the suspect vehicle "within a couple of days of some shooting we had in the District." Sergeant Ferguson, who was relying on Officer Schofield (who in turn, was relying on Officer Rice) testified that "a car matching that description that we observed in the block had been used in either a shooting *or a homicide the night before*." (Emphasis added).

station wagon was insufficient to meet even the relatively modest standard of "articulable suspicion." An informant's veracity, and the basis for his or her knowledge, remain highly relevant in the court's calculus. *Brown, supra,* 590 A.2d at 1014 (quoting *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)). As the government acknowledges in its brief, we have no information whatever on either subject. Moreover, the link between the wanted car and the double-parked station wagon was attenuated, and the government's case was further weakened by the demonstrated unreliability of the testimony of its highest-ranking witness.[11] As the trial judge recognized, Mayes' seizure cannot be sustained on the basis of the government's "wanted car" rationale. *Brown, supra,* 590 A.2d at 1015–19; *Cauthen, supra,* 592 A.2d at 1022–25; *see, generally, Alabama v. White, supra,* 496 U.S. at 330–32, 110 S.Ct. at 2416–17.

(5) "Totality of the circumstances."

▇▇▇▇ Because the existence or non-existence of articulable suspicion must be considered in the "totality of the circumstances," *White, supra,* 496 U.S. at 330, 110 S.Ct. at 2416, our inquiry is not confined to assessing whether the seizure was justified by the alleged traffic infraction, standing alone, or by the report of the wanted station wagon, standing alone. Rather, the trial court was required, and so are we, to include in the calculus both of these considerations, as well as the testimony regarding the reputation of "war wagons" and the character of the neighborhood.

We recognize that the whole may sometimes be more than the sum of its parts. *Cf. Peay, supra,* 597 A.2d at 1320. That reality makes this a closer case. Each of the enumerated factors can gnaw, just a little bit, at

the consciousness of the reasonably prudent officer. Maybe we know very little about the tip, that officer may tell himself, but after all, we are dealing with a war wagon. Moreover, it is night time and this is a neighborhood where drugs are sold and crime occurs.[12] The officer might well reason that surely, in the realistic and earthy world of the street, these facts in combination justify at least the minimal intrusion into the liberty of the subject which is effected by an order to step out of the car. Once Mayes has stepped out, the officer might add, we surely have to frisk him, for if this war wagon turns out, after all, to be the same one that was involved in a shooting, failure to frisk would be foolhardy, and my partner and I may not live to tell the tale.

The difficulty with this approach, however, is that it fails to recognize the lack of proportionality between the police response, including a frisk of the passenger, and the minor nature of the alleged precipitating violation by the driver. As Justice Harlan wrote in his concurring opinion in *Terry,*

> if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence.[13]

392 U.S. at 32, 88 S.Ct. at 1885 (emphasis in original). *See also Gomez, supra,* 597 A.2d at 891 (quoting this passage from Justice Harlan's opinion); 3 LAFAVE, *supra,* § 9.4(a), at 499–501, and authorities cited.

---

11. We have previously observed that the trial judge expressed skepticism as to Sergeant Ferguson's credibility, particularly regarding his erroneous characterization of 1429 A Street, N.E. as a "notorious" crack house.

12. The impact of Sergeant Ferguson's reliance on the "high crime" character of the neighborhood was appreciably reduced when it turned out that the building he described as "notorious" and as a crack house was nothing of the kind.

13. Because Justice Harlan italicized the word "forcible" in the first sentence of this passage we are satisfied that his reference to "presence" in the last sentence meant "compelled" presence. The Constitution obviously does not preclude an officer from walking up to the driver and talking to him, so long as no seizure is effected without the requisite articulable suspicion. *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877–76, 64 L.Ed.2d 497 (1980).

We stated in *Cousart, supra* note 7, and reiterate today, that

> [a]s a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking. *Bailey v. United States,* 128 U.S.App.D.C. 354, 364, 389 F.2d 305, 315 (1967) (concurring opinion).

*Cousart,* 618 A.2d at 101. But orders which are manifestly reasonable after a high speed chase are not so readily defensible just because a car with its motor running has been double-parked for a minute or so. *Cousart* is not this case. Mayes' motion was meritorious, and it should have been granted.

### B. Graves' Appeal.

 The legal issues presented by Graves' appeal are different from those that apply to Mayes. By the time Graves was searched and a pistol was recovered from his person,[14] Sergeant Ferguson had found a pistol on Mayes. Under these circumstances, the officers had the right to order the remaining occupants out of the car and, at least, to frisk them. *See, e.g., Lewis v. United States,* 399 A.2d 559 (D.C.1979). As we explained in *Lewis,*

> *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest ... must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance.

*Id.* at 561–62 (quoting *United States v. Berryhill,* 445 F.2d 1189, 1193 (9th Cir.1971); *see also Jones v. United States,* 544 A.2d 1250, 1251 (D.C.1988).

Graves contends, however—and this is his sole contention [15]—that the seizure of Mayes was unlawful, and that

> [t]he search and subsequent arrest of Appellant Graves pursuant to that arrest was therefore equally tainted; the pistol found as a result of that search should have been suppressed as evidence. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Basically, Graves asks us to hold that because the police violated Mayes' rights, and because that violation provided them with the basis for seizing Graves, the illegality of the seizure of Mayes requires the exclusion of the "tainted" evidence against Graves.

The Supreme Court has repeatedly held, however, that "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional

---

14. The government suggests that there is some uncertainty whether the pistol which Graves was convicted of carrying was recovered from Graves' person or from the vehicle. This is incorrect. Officer Schofield testified that Detective Ferguson recovered one weapon from Mayes, that another officer recovered one from the person of a second occupant (obviously Graves), and that she (Officer Schofield) found a third one in the car. At the plea proceeding, both the prosecutor and Graves confirmed that a pistol was recovered from Graves' person. *See West v. United States,* 604 A.2d 422, 427 (D.C.1992) (in reviewing trial court's disposition of motion to suppress, appellate court may consider undisputed evidence adduced in subsequent trial proceedings).

Moreover, the plea agreement independently corroborates the proposition that the pistol was on Graves' person. In return for conditional guilty pleas by the two men who were apprehended with pistols in their actual possession— Mayes and Graves—the prosecutor dismissed charges against the three remaining occupants of the car. If the charge against Graves had been based on a pistol found inside the vehicle rather than on him, the logic of the plea agreement would be questionable.

15. The record is somewhat hazy as to the circumstances under which Graves' pistol was recovered from him. It is not at all clear that the officers conducted only a "frisk," as distinguished from a full search; indeed, the testimony indicates that all five men were ultimately searched on the scene. Because Graves' only contention in both courts has been that the improper seizure of Mayes tainted the evidence against Graves, no issue as to the scope of the search of Graves was developed. In any event, the pistol was found on Graves' person, and its discovery may well have been inevitable whether Graves was searched or only frisked.

rights." *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980) (citations omitted). "[T]he defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *Id.* (emphasis in original).[16]

In *Payner*, law enforcement officers intentionally conducted a flagrantly illegal seizure and search of a briefcase belonging to Wolstencroft. They obtained evidence which incriminated Payner. Justice Powell, writing for the Court, was not favorably impressed by what he called the "unconstitutional and possibly criminal behavior of those who planned and executed this briefcase caper." *Id.* at 733, 100 S.Ct. at 2445. Nevertheless, the Court held that the United States Court of Appeals was without authority to order the exclusion of the evidence seized from Wolstencroft, either under the Fourth Amendment or pursuant to the appellate court's supervisory power, for that seizure violated Wolstencroft's privacy, not Payner's. Similarly, because the seizure and frisk of Mayes did not implicate Graves' own expectation of privacy, Graves is precluded, under *Payner*, from challenging it. Accordingly, we must affirm Graves' conviction.[17]

---

Both Mayes and Graves were passengers in the same car when it was approached by the police. Each man had a handgun. At first blush, it may appear surprising that one of them has a criminal conviction while the other goes "free." There is, however, a critical (though fortuitous) difference between their situations. When the police frisked Mayes, they had no legal basis for doing so. By the time it was Graves' turn, they did.

## IV.

## CONCLUSION

Mayes' conviction is vacated and his case is remanded to the trial court with directions to grant his motion to suppress. Graves' conviction is affirmed.

*So ordered.*

---

**16.** We note that the trial judge did not base his denial of Graves' motion on Graves' lack of standing to invoke Mayes' rights. The government adverted in its brief to the problem of standing, but did not predicate its argument on the point which we find decisive. A judgment must be affirmed, however, if the result is correct, even if the trial judge relied on a wrong ground or gave a wrong reason. *See In re O.L.*, 584 A.2d 1230, 1232 n. 6 (D.C.1990); *Craig v. United States*, 551 A.2d 440, 440 n. 4 (D.C.1988). We discern no unfairness in deciding this appeal on the basis of Graves' lack of standing; given the *Payner* doctrine, further briefing would be futile. *See, e.g., B.J.P. v. R.W.P.*, 637 A.2d 74, 80 n. 11 (D.C.1994).

**17.** We assume, without deciding, that the actions of the police in ordering Mayes out of the car and frisking him would have conveyed to a reasonable person in Graves' position the message that he was not free to leave the vehicle; upon that assumption, Graves was seized. *See, e.g., In re J.M.*, 619 A.2d 497, 501 (D.C.1992) (en banc). A suspect "may not be detained even momentarily without reasonable, objective grounds for doing so." *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion). The detention of Graves became legitimate at the latest, however, when Sergeant Ferguson frisked Mayes and discovered a pistol on his person; that discovery legitimized a seizure of the others in the car. *Lewis, supra*, 399 A.2d at 561–62.

Graves has not argued, either to the trial court or on appeal, that aside from the seizure of Mayes, he (Graves) was unlawfully detained for the brief period—apparently a matter of seconds—between the arrival of the police and the discovery of Mayes' weapon. The government thus has not had the occasion to respond to such a contention in either court, and we therefore decline to address the issue.