**Kevin D. BENNETT, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 09–CF–725.**

District of Columbia Court of Appeals.

Argued June 16, 2011.

Decided Aug. 25, 2011.

Shilpa S. Satoskar, Public Defender Service, with whom James Klein and Samia Fam were on the brief, for appellant.

Andrea Hertzfeld, Assistant United States Attorney, for appellee. Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Ann K.H. Simon, Suzanne Grealy Curt, and Sean Lewis, Assistant United States Attorneys, were on the brief.

Before FISHER and THOMPSON, Associate Judges, and KING, Senior Judge.

THOMPSON, Associate Judge:

At a show-up identification, a robbery victim identified appellant Kevin Bennett as one of the assailants and Bennett was arrested. The robbery charge against Bennett eventually was dropped, but during a search incident to his arrest as a robbery suspect, police found cocaine in Bennett's pocket. Bennett subsequently entered a conditional guilty plea on a charge of attempted possession with intent to distribute cocaine, reserving the right to appeal the trial court's denial of his motion to suppress the cocaine. In this appeal, Bennett argues that the trial court erred in denying the suppression motion because the police seized him for the show-up identification without reasonable articulable suspicion or an exigent-circumstances basis to detain him, and because it was the unlawful seizure that enabled the chain of events that led to his arrest and search and thus to discovery of the cocaine. We are persuaded by appellant's argument and therefore reverse his conviction.

## I.

At the suppression hearing, held on March 30 and April 3, 2009, the trial court heard testimony from Metropolitan Police Department ("MPD") Officers Kevin Kirby and Nathan Clarke and Sergeant John McDonald. Kirby testified that on August 29, 2008, at 9:42 p.m., he and his partner Clarke heard over the MPD radio that a robbery had "just occurred" in the 1600 block of R Street, N.W. According to Kirby, this broadcast (the "first lookout") was for "five black males," one of whom was wearing a red hat and red shirt, and had braids or dreadlocks. Clarke testified that the first lookout contained information that the first suspect had a red hat, a red jacket and braids, and that a second suspect had on a blue shirt and dark jeans. Kirby and Clarke drove toward the area in an attempt to "cut ... off" the perpetrators.

Meanwhile, Sergeant McDonald went to the scene of the robbery and found the victim, who was bleeding but "not incoherent." The victim told McDonald that he had been assaulted by "five black males" in their late teens or early twenties and that two of them were on bicycles acting as lookouts. The victim described two of the five men: one with dreadlocks wearing a red hat and "a red shirt or a red and white shirt," and one wearing "a blue shirt." McDonald did not recall the victim saying anything about the hairstyle or pants worn by the person in the blue shirt or about the direction in which the suspects were

traveling. McDonald testified that on the basis of that information, he made the following broadcast (the "second lookout"): "Five black males, two on bicycle; one with a red hat, either red or red and white shirt with dreadlocks; and the second black male with the blue T-shirt." His lookout also included that the suspects were in their late teens or early twenties.

"[A]lmost immediately" after the second lookout, Kirby and Clarke turned onto R Street about a block and a half east of the reported crime scene and saw a black man with a red hat and red shirt, later identified as Odessey Johnson, leaning against a car. Next to Johnson, the officers saw appellant Bennett, also leaning against the car, standing about a foot away from Johnson, and smoking a cigarette. A third man was on the sidewalk near Johnson and appellant, and the three men were "congregated, talking to one another."[1] The three men did not attempt to leave when the officers arrived, but were just "standing there by that car." Appellant was wearing a white shirt with a black squiggly design, a black jacket, and blue jeans, and had braids or dreadlocks. He was not wearing a blue shirt.

The officers approached the men and told them that they "were investigating a crime" and "wanted to talk to them." The officers asked the men their names, "where they were coming from," and "[h]ow long they had been outside standing there," and asked for their cooperation with the officers' investigation. Appellant responded that he lived on the block and had just come outside, but then he "started exchanging words with [the officers]" and became "argumentative" and "very appre-

hensive." The officers let the third man go because he did not match the lookout and the officers did not think that he was involved in the robbery. Appellant and Johnson, on the other hand, were "deemed possible suspects," were "detained without handcuffs," and "were not free to go."

Kirby and Clarke both testified that they had no reason to believe that either appellant or Johnson was armed. Kirby explained that he "didn't have any knowledge of weapons used" during the reported crime. He also agreed that he did not have a description that matched appellant. Instead, Kirby stated, the officers stopped both men because "they were both right next to each other," and because "just based on our descriptions of what he had ... we'd been told there was five and I knew that if there's a group of five, then I have one that matches exactly and then, you know, I still have three unknowns at this point. So we're just looking to separate, I.D. and, see what happens, see how it comes from that."

The officers determined that they should "separate[ ] the two [men]." Kirby took Johnson aside,[2] while Clarke "stayed with" appellant while he paced back and forth and spoke on the phone. One of appellant's phone calls was to his mother, who then arrived and talked with appellant. At one point, Clarke asked appellant for identification, which appellant refused to provide, but other officers who arrived on the scene later obtained appellant's identification.

Kirby and Clarke radioed McDonald and said that "they had an individual stopped matching the description." McDonald told them not to "let him go" because Mc-

---

1. There were also other people on the block, mostly black men.

2. Kirby told Johnson "that there was a fight or, you know, somebody was beat up," and

that if he would "just sit here for a minute or two and let [the officers] do whatever [they had] to do," then if it was "not [him], then [he'd] just be on [his] way."

Donald was bringing the victim to their location to conduct a show-up identification.[3] McDonald drove the victim to the location, where, from the back seat of the car, the victim identified Johnson. The officers then brought appellant to a location about thirty feet from the car, and shone a light on him. The victim identified appellant, stating that appellant "was there, too." That identification occurred at 10:05 p.m. Appellant was arrested, handcuffed, and placed in a squad car. In a search conducted at the police station, police found crack cocaine in the pocket of his jeans.

A tape recording of MPD radio transmissions from that night was admitted at the hearing without objection. The tape included the 911 call reporting the robbery as well as "twenty-four minutes of radio run." The tape revealed that the 911 caller stated that a man had been attacked and beaten up, with "fists," fifteen to thirty minutes earlier (the victim's estimate) by five black people, one in a red shirt. No mention was made of any weapons being involved. The tape also included the first lookout for suspects in their late teens, one with a red cap, and "no last known direction." However, the tape did not contain McDonald's lookout because the "dispatcher's voice [was] talking over [his] on the tape."

At the close of the suppression hearing, the court credited McDonald's testimony that he broadcast a lookout for five black males in their late teens or early twenties, including one with dreadlocks, a red hat, a red or red and white shirt, and one with a blue T-shirt. The court observed that it appeared that the officers had no information about the assailants' direction of travel.[4] In addition, the court found that less than fifteen minutes elapsed between the first lookout and the officers' initial encounter with Johnson and appellant, and that it was in fact "maybe close to five, maybe six, seven minutes." The court made no finding as to the time that elapsed between the robbery and the lookouts.

In announcing its conclusions of law, the trial court did not address whether the officers had a reasonable articulable suspicion that appellant was involved in the robbery. Rather, referring to this court's decision in *Trice v. United States*, 849 A.2d 1002 (D.C.2004), the court reasoned that it was permissible for the officers to "detain [appellant] for purposes of asking questions" even though he did not match the lookout, because he was "standing next to a suspect whose description [had] been satisfied."[5] The court therefore denied the suppression motion. There followed appellant's conditional guilty plea and this appeal from the denial of his suppression motion.

## II.

To recap, appellant contends that the officers seized him in violation of his Fourth Amendment rights; that the drugs that were found (after he had been identified at the ensuing show-up, arrested, and then searched incident to arrest) were the fruits of the illegal seizure; and that the trial court erred in denying his motion to suppress the cocaine.

---

3. During the wait for the show-up, officers obtained and checked appellant's identification and discovered that he did not have any current warrants.

4. This was notwithstanding Officer Kirby's testimony that the first lookout stated that the robbers were "last seen on foot going eastbound."

5. The court reasoned that the evidence against appellant matched "more than three-quarters [of] the facts in *Trice*."

■ Where a defendant shows that "a warrantless search or seizure produced evidence that the government seeks to introduce at trial," such as the cocaine evidence here, "the burden is on the government to . . . justify[ ] the search based on facts that could bring it within certain recognized, limited exceptions to the warrant requirement." *Womack v. United States*, 673 A.2d 603, 617 (D.C.1996) (citations omitted). One exception is that "[t]he police may briefly detain a person for an investigatory or *Terry* stop, even if they lack probable cause, if the officers have a reasonable suspicion based on specific and articulable facts" that the person has "just committed a crime." *Pinkney v. United States*, 851 A.2d 479, 493 (D.C.2004) (citations and internal quotation marks omitted). An articulable suspicion is "substantially less than probable cause, but more than a mere 'hunch' or 'gut feeling.'" *James v. United States*, 829 A.2d 963, 966 (D.C.2003) (citation and internal quotation marks omitted); *United States v. Turner*, 699 A.2d 1125, 1128 (D.C.1997) (explaining that a police officer's "inchoate and unparticularized suspicion or 'hunch'" is not sufficient) (emphasis removed). "[R]easonableness" is based on the "totality of the circumstances . . . view[ed] . . . through the lens of a reasonable police officer, guided by his training and experience." *Pinkney*, 851 A.2d at 493 (citation and internal quotation marks omitted).

■ To justify a *Terry*[6] stop, "the detaining officers must have a particularized and objective basis for suspecting *the particular person stopped* of criminal activity." *Umanzor v. United States*, 803 A.2d 983, 992 (D.C.2002) (emphasis added); *see also Ybarra v. Illinois*, 444 U.S. 85, 91–92, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Seizures based on "guilt by association" run afoul of the bedrock Fourth Amendment requirement of particularized suspicion to conduct a *Terry* stop. *Trice*, 849 A.2d at 1006; *see also Carr v. United States*, 758 A.2d 944, 945–47 (D.C.2000) (finding no reasonable articulable suspicion to stop defendant when he was standing beside car and talking to its occupants while person standing on other side of car was smoking marijuana); *Smith v. United States*, 558 A.2d 312, 315 (D.C.1989) (en banc) (finding defendant's conversation with suspected drug dealer insufficient to support stop); *cf. Ybarra*, 444 U.S. at 91, 100 S.Ct. 338 ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

■ In reviewing the trial court's ruling on a motion to suppress, this court "must view the evidence in the light most favorable to the prevailing party." *Barrie v. United States*, 887 A.2d 29, 31 (D.C. 2005) (citations omitted). As a result, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Milline v. United States*, 856 A.2d 616, 618 (D.C.2004) (citation and internal quotation marks omitted). We "defer to the motions court's findings of fact as to the circumstances surrounding the appellant's encounter with the police and [must] uphold them unless they are clearly erroneous." *Porter v. United States*, 7 A.3d 1021, 1024 (D.C.2010) (citations and internal quotation marks omitted; brackets in original). However, legal conclusions on Fourth Amendment issues, including whether a seizure has occurred and, if so, whether it was justified by reasonable articulable suspicion, are legal questions that we review *de novo. Jacobs v. United States*, 981 A.2d 579, 582 (D.C. 2009).

---

6. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

### III.

 We have little trouble concluding that the police officers seized appellant well before his show-up identification and arrest. "The crucial test for determining whether a person has been seized is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *In re J.F.*, 19 A.3d 304, 308 (D.C.2011) (citation and internal quotation marks omitted). The government concedes that there was a "momentary detention" of appellant that "preceded his own identification," but the facts lead us to conclude that the police "restrained [appellant's] liberty"[7] earlier than that. Officer Kirby testified on cross-examination that appellant wasn't free to leave because "I mean, we had stopped him." Officer Clarke agreed that appellant and Johnson "were not free to go" while the officers waited for the show-up. Referring specifically to "the point [in time] when appellant was pacing" back and forth, Clarke testified that appellant "was not free to leave." Clarke could not recall verbatim what he said to appellant, but he conveyed to appellant the message that appellant should "stay here and let us do what we're doing."[8] We think the officers conveyed that same message through their conduct when—having let a third man go—they physically separated appellant from Johnson and Officer Clarke took up the task of "stay[ing] with" appellant as appellant paced back and forth and spoke on his phone. Under these circumstances—and notwithstanding that the several officers on the scene did not draw their weapons or otherwise make a display of force—no reasonable person in appellant's position would have believed that he was "free to decline the officers' requests or otherwise terminate the encounter," *Bostick*, 501 U.S. at 438, 111 S.Ct. 2382, 115 L.Ed.2d 389, or that he was "at liberty to ignore the police presence and go about his business." *In re J.F.*, 19 A.3d at 308.

 We also agree with appellant that when the officers stopped him, they lacked the requisite particularized and reasonable articulable suspicion that he had committed a crime. First and foremost, appellant did not match the lookout broadcast by the police. The lookout for five black males in their teens or early twenties described two men—one with dreadlocks wearing a red hat and a red or red and white shirt, and one wearing a blue shirt. Appellant was standing next to a man wearing a red hat and red shirt, but he did not match the description of the other suspect because he was wearing a white shirt, not a blue shirt.[9] The government therefore established "no meaningful similarities" between appellant and the second suspects

---

7. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (citing *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868).

8. *Cf. United States v. Coggins*, 986 F.2d 651, 652–54 (3d Cir.1993) (holding that defendant was seized when officer told him to stay and wait until officer finished interview).

9. Relying on Officer Clarke's testimony that Sergeant McDonald's lookout described the second suspect as having braids and as wearing dark jeans in addition to a blue shirt, the government argues that appellant did match the description, since he was a young black male with braids and dark jeans. However, the trial court credited McDonald's testimony regarding "the information he got from the complaining witness," i.e., that the victim could describe the second individual only by reference to his "blue shirt," and that the only information about the second suspect in the lookout McDonald gave after speaking with the victim was that the suspect was a black male in his late teens or early twenties wearing a blue T-shirt.

"except that [appellant], like the [other suspect], [was] a black male." *Brown v. United States*, 590 A.2d 1008, 1019 (D.C. 1991); *see also In re T.L.L.*, 729 A.2d 334, 340 (D.C.1999) ("[A] description applicable to large numbers of people will not suffice to justify the seizure of an individual.") (citation and internal quotation marks omitted).

 Other factors that may warrant a conclusion that a stop was justified include "the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Singleton v. United States*, 998 A.2d 295, 299 (D.C.2010) (citation and internal quotation marks omitted). In this case, none of these factors justified the stop, as there was no evidence that appellant was found in a high crime area; he did not attempt to flee from the officers; he answered questions, telling the officers where he had came from and where he lived; he turned over his identification (albeit after initially refusing); and there was no evidence that he made any furtive gestures or inculpatory statements or that the officers saw a bulge indicating a weapon. Although Kirby and Clarke testified that appellant was

"argumentative," "apprehensive," and "un-cooperative," this did not provide the reasonable articulable suspicion to detain him. "Citizens have no legal obligation to talk to the police," and an individual's "attempt to exercise his right not to participate in an encounter" with police officers does not "constitute the kind of conduct on the scene that could significantly bolster the government's showing of ... articulable suspicion." *Brown*, 590 A.2d at 1019, 1020.

Further, as noted, the trial court found that there was no broadcast of the direction toward which the assailants fled. For that reason, and because many other people were out and about on the same block, appellant's location in relation to the scene of the robbery could not create particularized suspicion about him. Further, the lapse in time between when the robbery occurred and when the stop occurred was long enough that it did not reasonably support an inference that appellant was involved in the robbery because of either his proximity to the crime scene or his proximity to the man in the red shirt and hat. The only factual finding the trial court made regarding timing was that the time that elapsed between the broadcast of the first lookout and the stop was "maybe close to five, maybe six, seven minutes." [10]

---

10. Appellant argues, however, that the record "establishe[s] with clarity" that the time lapse between the robbery and the officers' encounter with Johnson and appellant was "fifteen to thirty minutes." He bases this calculation on the tape of the 911 call. On the tape, the dispatcher asked the caller how long it had been since the robbery occurred, after which the victim could be heard in the background telling the caller that the robbery happened "fifteen minutes or half an hour" prior to the call. (Although neither party provided us with the tape, appellant's counsel recounted the contents of the tape to the trial court after having heard it, and McDonald, who had also listened to the tape, confirmed that the information was accurate.) Appellant adds the trial court's "five, maybe six, seven"-minute

finding to the victim's fifteen-to-thirty minute estimate and arrives at the conclusion that the police encountered appellant twenty-one to thirty-seven minutes after the robbery occurred. Even if this estimate is reasonable, it is not particularly helpful to our analysis, because we are required to assess the existence of reasonable articulable suspicion by considering the information that the officers possessed at the time they made the stop. *See Joseph v. United States*, 926 A.2d 1156, 1166 (D.C.2007) ("[T]he standard for determining whether a police officer had a reasonable articulable suspicion is whether 'the facts available to the officer at the moment of the seizure or the search [would] 'warrant a man of reasonable caution in the belief' that the

Of course, the events before the first lookout did not all occur simultaneously; each step—the assault and robbery, the passerby finding the victim, the passerby phoning 911, the length of the 911 call, and the time it took the 911 dispatcher to translate that call into the first lookout—took some amount of time. For that reason, and viewing the record in the light most favorable to the government, we will assume for the sake of our analysis (relying on the upper range of the trial court's "five, maybe six, seven minutes" estimate) that when the officers encountered and first questioned appellant, they were aware that seven or more minutes had passed since the robbery. Seeing appellant seven or more minutes after the robbery, standing outside his home located a block and half away from the scene of the robbery and standing in a fashion that did not suggest that he had just arrived at that location, did not afford the officers a reasonable basis for a particularized suspicion that appellant was one of the robbers.

In support of its position that the facts known to the officers and elicited at appellant's suppression hearing do support a conclusion that the officers had reasonable articulable suspicion, the government cites *Pinkney v. United States*, 851 A.2d 479 (D.C.2004). In *Pinkney*, "within seven minutes" after a shooting, a lookout was broadcast for two suspects, one wearing a black jacket and blue jeans and one wear-

ing a blue and gold Notre Dame jacket. *Id.* at 483. An officer driving in the same block where the shooting occurred saw the defendant running with a man wearing a blue and gold Notre Dame jacket and stopped them. *Id.* at 483–84. The stop occurred less than twelve minutes after the shooting. *Id.* Although the officer could not remember the lookout description of the second assailant, we upheld the stop of defendant because the officer saw the defendant in the described location running with a man wearing the "very distinctive jacket" described in the lookout "so soon after the shooting and in such close proximity to its site." *Id.* at 494.

But *Pinkney* is readily distinguishable from the instant case. There, the officer made visual contact with the two men "moments" after the lookout was broadcast, whereas here, the visual contact was made several minutes after the lookout; the *Pinkney* lookout pinpointed the suspects' exact location, whereas here, the location was unknown; and most importantly, in *Pinkney*, the defendant and the man in the distinctive jacket were running, whereas here, appellant and Johnson were standing still, resting against a car and conversing, on the same block on which appellant lived. *Id.* at 493–94. Further, in *Pinkney*, the officer could not recall the description of the second suspect, whereas here, the officers remembered that the second suspect was described as wearing a

---

action taken was appropriate[.]' ") (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868) (citations and emphasis omitted). The record does not support an assumption that Kirby or Clarke understood that the robbery had taken place twenty-one to thirty-seven minutes before they saw appellant and Johnson.

The government asserts that the victim's fifteen-to-thirty minute estimate is "implausible," given that he was bleeding and "woozy" when McDonald arrived. The government also cites Kirby's testimony about hearing a call about a robbery that had "just occurred"

within "minutes" before the first lookout, Clarke's testimony that the crime occurred "[w]ithin five minutes" before the first lookout, and McDonald's testimony that the crime had "just occurred" when he arrived at the victim's location after the first lookout (even though the record suggests no basis upon which the officers made those statements). In the government's estimation, seven to twelve minutes passed between the time of the robbery and the time when the officers encountered appellant.

blue shirt, and it was apparent to them that appellant was not wearing a blue shirt.[11]

In sum, the government did not meet its burden of showing that when the officers stopped appellant, they had reasonable articulable suspicion that was "particularized as to the individual stopped." *In re A.S.*, 614 A.2d 534, 537 (D.C.1992). They found appellant—who, other than being a young black male, did not match the description of the suspects—standing still and smoking a cigarette outside of his home, which was a block and a half from the scene of the robbery, at least seven minutes after the crime. Appellant did not attempt to flee, and he made no furtive gestures. He raised suspicion only because he was standing next to a man, Johnson, who did match the lookout description of one of the suspects. The officers had no basis for suspecting appellant other than a inference of "guilt by association," which does not justify a *Terry* stop.[12]

## IV.

That does not end our analysis, because we must consider whether, as the trial court concluded, the stop nevertheless was justified under the rationale of *Trice*. We hold that it was not.

In *Trice*, police officers heard a lookout for a suspect in a stabbing at a hospital. The lookout described the suspect as a "[b]lack male wearing a black, red and white shirt" who "had left the hospital between one and five minutes ago and was heading towards Elmira Street." *Trice*, 849 A.2d at 1004 (internal quotation marks omitted). Two minutes later, a detective saw two men walking side by side toward Elmira Street, which was a block or two away. *Id.* One of the men, Castle, fit the lookout description, but the other, Trice,

11. The government also cites several other cases to support its position, but each involved elapsed time between the crime and the stop that was much shorter than the time involved here. *See, e.g., United States v. Turner*, 699 A.2d 1125, 1128–30 (upholding the stop of a man who matched the general description of a black male wearing a black jacket and blue jeans because he was found *"within a minute"* on the block indicated in the lookout, and noting that although such a general description does not suffice to justify a seizure, "an imperfect description, coupled with close spatial and temporal proximity between the reported crime and the seizure, justifies a *Terry* stop") (emphasis added); *King v. United States*, 550 A.2d 348, 350, 357 (D.C.1988) (finding that officers had reasonable articulable suspicion to stop two individuals who generally matched the lookout description of a "skinny black male, wearing glasses, blue jeans, and a plain long-sleeved shirt hanging outside his pants" accompanied by a "heavy set black female wearing a gray sweatshirt-type top and dark colored pants," where the officers encountered the individuals together *"[w]ithin a minute or so"* after the drug sale, close to the location described

in the lookout, and "beginning to drive away") (emphasis added); *Milline v. United States*, 856 A.2d 616, 618–20 (D.C.2004) (upholding the defendant's *Terry* stop despite the fact that the officers recalled only the lookout description of his companion, because he was stopped "[w]ithin thirty seconds to a minute" after an undercover officer witnessed a drug transaction and radioed the lookout for two suspects, was in the exact spot that the lookout described, and was with a man who matched the second suspect's description) (emphasis added).

12. At least arguably, the officer's totality-of-the circumstances basis for stopping appellant grew somewhat stronger after the victim identified Johnson as one of the assailants. But even if we assume *arguendo* that "the identification of Mr. Johnson … justif[ied] the momentary detention [of appellant] that preceded [appellant's] own identification," the relevant point is that we cannot assume that, without the earlier unjustified seizure, appellant would have remained on the scene with cocaine in his pocket, setting into motion the developments that resulted in his conviction for possession with intent to distribute.

did not. *Id.* The detective drew his weapon and ordered the men to stop and put their hands on his car. *Id.* Despite the conceded lack of reasonable articulable suspicion that Trice was involved in the stabbing, *id.*, we upheld the stop. While recognizing the general rule that "legally sufficient grounds to stop a particular person who [the police] suspect has committed a crime ... is usually not a sufficient justification in itself for stopping the suspect's companions or other bystanders too," we held that the "exigent circumstances" confronting the officers justified the stop of Trice along with Castle. 849 A.2d at 1004. Because the officers had "validly stopped a person whom they reasonably suspected of being armed, dangerous, and escaping from the scene of a violent crime, the police validly could stop the suspect's companion ... as well." *Id.*

We explained that two narrow exceptions allowed the officers to " 'freeze the situation' briefly by forcibly detaining Trice along with Castle until help arrived." 849 A.2d at 1008. First, "immediate safety concerns" justified the detective's actions. *Id.* at 1006 ("Despite the general rule [against 'guilt by association'], immediate safety concerns may justify police in stopping, or stopping and frisking, a person based on his association with someone else whom the police reasonably suspect of criminal activity."). We held that the suspicion that Castle was armed and dangerous justified the detective's actions: "A violent crime involving the use of a knife reportedly had just been committed nearby, and Castle matched the description of the criminal.... As he was walking with Castle, Trice appeared to be the companion of a potentially violent, fleeing criminal

and not a mere bystander." 849 A.2d at 1008.

Second, we held that Trice could be detained for questioning as an eyewitness, even if there was no reasonable suspicion that he was culpable, under the rationale of *Williamson v. United States*, 607 A.2d 471, 477 (D.C.1992) (per curiam) (holding that police could stop a car leaving the scene of a shooting in order to question witnesses because "[s]hort of the stop of [the] vehicle, there was no reasonable way in which the officer could obtain immediate information about the shooting which these occupants could reasonably be expected to provide"). *Trice*, 849 A.2d at 1008. We explained in *Trice* that "given the recency of the crime, it was reasonable to think that if Castle committed it, his companion Trice likely was aware of that fact and was a witness if not also an accomplice ... who could furnish critical information about the stabbing," and thus it was constitutionally permissible for the detective to "freeze the situation briefly" to gather the necessary information. *Id.* (internal quotation marks omitted).

■■■■ Neither of the narrow exceptions discussed in *Trice* applies to appellant's case. The lookout was about an unarmed robbery, the officers acknowledged having no reason to believe that either appellant or Johnson was armed, they did not claim to have safety concerns, and the government did not even attempt to justify the detention in that way.[13] The officers did not frisk either Johnson or appellant, and they allowed appellant to pace up and down, use his cell phone, and interact with his mother. We "cannot impute a safety concern to the trained officer[s] where [they] did not indicate in any way that [they] apprehended danger and where the

---

**13.** For the first time on appeal, the government claims that appellant "posed a potential threat" to the officers. But it never made that argument to the trial court, and the record does not support such an argument.

evidence does not otherwise support such a claim." *Jackson v. United States*, 742 A.2d 883, 885 (D.C.1999) (citation omitted). In short, the safety rationale of *Trice* is inapplicable in this case.

 The eyewitness exception is similarly inapposite here. We have emphasized that "the police are justified in stopping witnesses only where exigent circumstances are present," *Williamson*, 607 A.2d at 476, and that the authority to detain witnesses "is much more narrowly circumscribed than the authority to stop suspects." *Hawkins v. United States*, 663 A.2d 1221, 1226 (D.C.1995) (citation and internal quotation marks omitted). The law allows "the brief detention of potential witnesses in ... certain situations" so that "an officer coming upon the scene of a recently committed crime [can] freeze the situation and obtain identifications and an account of the circumstances from the persons present." *Williamson*, 607 A.2d at 476 n. 4 (quoting LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2(b)). But the exception under discussion does not permit police officers to detain someone simply because they believe the person is a potential witness to a crime; rather, it applies only in those exigent circumstances where police see a "fast-moving scenario" involving a poten-

tial witness in "flight" after a "just-completed crime," and where no other methods of investigation are readily available. *Hawkins*, 663 A.2d at 1226–27. *See Williamson*, 607 A.2d at 472, 476–77 (upholding a stop where potential witness was driving away from scene of shooting and police had no other way to question him). Further, the witness rationale cannot justify a detention whose scope exceeds what is "necessary to obtain [the witness's] prompt account of the [crime]." *Id* at 477; *see also Mayes v. United States*, 653 A.2d 856, 862 (D.C.1995) ("A seizure must be reasonably related in scope to the justification for its initiation" because "proportionality is the key to reasonableness in Fourth Amendment jurisprudence") (citation, internal quotation marks, and brackets omitted). The witness exception allows a brief detention of a person suspected to be an eyewitness to a crime just committed by a perpetrator "reasonably suspected of being armed, dangerous, and escaping from the scene." *Trice*, 849 A.2d at 1004; *see also Williamson*, 607 A.2d at 472, 476–77 (applying exception to allow officers to conduct on-the-scene inquiry of witnesses who were driving away from scene of shooting).[14]

Here, the police detained appellant in the absence of exigent circumstances that

---

14. These limitations are illustrated by *Williamson*, on which the *Trice* court relied. Unlike Kirby and Clarke in the instant case, the officers in *Williamson* were confronted with "a rapidly moving street occurrence ... involving a dangerous weapon." 607 A.2d at 471 (Farrell, J., concurring). While investigating an assault, an officer heard gunshots fired from across the street. He saw one car speed away and stopped another car that was also leaving the scene in a hurry. *Id.* at 472. As explained in *Trice*, a majority of the court in *Williamson* "concluded that the police did not have a reasonable articulable suspicion that any of the car's occupants were participants in the shooting." *Trice*, 849 A.2d at 1008 (citing *Williamson*, 607 A.2d at 478) (Schwelb, J., concurring); *id.* at 481 (Ferren,

J., concurring). The majority concluded, however, that the police could have reasonably believed that the occupants of the fleeing car were witnesses. A "brief detention" of the occupants was constitutionally permissible because "(a) the repeated discharge of a firearm involved the possibility of forcible injury to persons; (b) the officer had reason to believe that [the defendant]—if not himself a participant—had knowledge material to the investigation; and (c) the detention of appellant and the other occupants was necessary to obtain their prompt account of the shooting." *Williamson*, 607 A.2d at 477 (Farrell, J., concurring); *see also id.* at 481 (Schwelb, J., concurring) ("The Fourth Amendment was not designed to consign to virtual impotence a police officer who is attempting to investigate

would have satisfied the "narrowly circumscribed" witness exception. The seizure of appellant was not a brief stop conducted to freeze a fast-moving and dangerous situation so that a witness could be questioned before he fled the scene of the crime. Appellant was not fleeing, but instead— over seven minutes after the robbery—was standing on his street smoking a cigarette. When the police approached him, he may have been argumentative, but he ultimately answered their questions and gave them his identifying information. He also spoke to his mother via cell phone and paced up and down the street, where she joined him. This controlled, relatively calm scenario is the opposite of the quick sequence of events that occurred in *Trice* following a violent crime involving a weapon. Further, there was no danger that the police would lose the opportunity to question appellant about the crime, since they obtained his identifying information and would have been able to locate him for further questioning if necessary. *Cf. Hawkins*, 663 A.2d at 1226–27 (declining to apply *Williamson* exception where other methods of investigation were "readily available").[15]

## V.

■ Appellant's detention was not based on particularized, reasonable articu-

lable suspicion and was not justified by either of the narrow exceptions to *Terry* allowing for a brief stop under exigent circumstances. Because the police detained appellant for a show-up identification on the sole basis that he was standing next to a person who was reasonably suspected of committing a robbery, his detention, subsequent arrest, and incident search violated the Fourth Amendment. We therefore reverse the trial court's ruling denying appellant's motion to suppress the drugs found in that search. Because appellant's guilty plea was conditioned on that ruling, his conviction likewise is

*Reversed.*

---

an apparent armed offense moments after it occurred, and who needs information to help him to apprehend the perpetrator and thus to reduce the risk of injury to persons or property.").

15. Even if *arguendo* a witness rationale existed at the time the officers initially approached appellant, that rationale disappeared once they finished questioning him, ascertained nothing connecting him to the robbery, and obtained his identifying information. Once the questioning was complete, appellant was held as a "possible suspect[ ]" in the robbery until the victim arrived to conduct the show-

up identification. But at that point, absent a reasonable suspicion to believe that appellant had a weapon, police had no basis to extend appellant's detention until the show-up identification could be conducted. *See Hawkins*, 663 A.2d at 1227 (explaining that because "the police stopped [Hawkins] to question him about his attackers in his pending assault case," it "logically follow[ed] that the scope and duration of their questioning should have been limited to this purpose unless 'articulable suspicion' or probable cause of criminal activity by [Hawkins] developed *during* the encounter") (emphasis in original).