*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-CF-839, 14-CF-840, 17-CO-532, and 17-CO-533

WILLIE WALKER, JR., APPELLANT,

V.

UNITED STATES, APPELLEE,

and

Nos. 14-CF-841, 15-CO-904, and 16-CO-891

RICKY DONALDSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-16946-08 and CF3-16948-08 – Walker)
(CF1-25684-08 – Donaldson)

(Hon. John Ramsey Johnson, Trial Judge)

(Argued October 17, 2018                    Decided February 21, 2019)

*Nathaniel S. Wright,* with whom *Jeffrey T. Green*, *Lindsey N. Walter*, and *Robin E. Wright* were on the brief, for appellant Willie Walker, Jr.

*Nancy E. Allen* for appellant Ricky Donaldson.

*Valinda Jones*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Nicholas P. Coleman*, *Kimberley C. Nielsen*, and *Jeffrey Pearlman*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and FISHER, *Associate Judges*.

FISHER, *Associate Judge*:  In these consolidated appeals, Willie Walker, Jr. and Ricky Donaldson challenge the trial court's denial of their post-trial motions, which claimed that they were entitled to a new trial because of newly discovered evidence.  Walker also asserts that reversible error occurred during the trial.  We affirm.

## I.    Background and Procedural History

Appellants Willie Walker, Jr. and Ricky Donaldson were tried by a jury between January and March 2014.  The charges arose out of three separate events: the February 4, 2008, shooting of Patricia Holmes; the March 31, 2008, shooting of Delois Persha; and the September 13, 2008, murder of Delois Persha.  Walker was found guilty of several crimes in connection with the three events and sentenced to 88 years in prison.  Donaldson was found guilty of several crimes in connection with the murder of Persha and sentenced to 45 years in prison.

## A. Appellants and Their Victims

Walker (known as "Wee Wee") and Donaldson (known as "Slick") were members of the LeDroit Park crew. The crew was involved in selling drugs and committing violent crimes, and its members stored communal guns and ammunition in "trap houses" in the neighborhood. The government alleged that the LeDroit Park crew was a criminal street gang, citing evidence of the crimes its members committed and graffiti with messages such as "DBD" or "Death Before Dishonor," "Kill Rats," and "Respect G's or Die," meaning snitching was not tolerated and members of the crew would die before snitching to the government.

Walker and Donaldson were close friends with Devon Davis[1] (also known as "D Nice") who had a court-imposed curfew while Walker was incarcerated. Patricia Holmes (known as "Trish") grew up in LeDroit Park and bought drugs from many people there, including Walker, whose family she had known since before Walker was born. In the past Holmes had run errands for Walker and they got into physical altercations in which Walker threatened to shoot and kill Holmes. Delois Persha (known as "Peaches") had known Walker "since he was a baby" and

---

[1] Devon Davis was indicted with Walker and Donaldson, but entered a guilty plea and was sentenced in 2012. Davis did not testify at the instant trial.

had seen him selling drugs. Holmes and another witness from the neighborhood testified that they knew Walker as "Wee Wee."

## B. The Shootings

Patricia Holmes was shot outside of Jerry's carry-out restaurant at the intersection of Georgia and Florida Avenues, N.W., on February 4, 2008, after getting into an argument with appellant Walker. When the police arrived at the scene, Holmes repeatedly screamed, "Wee Wee shot me." Two days later, Holmes looked at a nine-photo array and identified Walker as the shooter. Before her grand jury testimony in August 2008, Holmes identified Walker as "Wee Wee" from a book containing photographs of approximately 50 different people. (The jury was not told of this identification.) At trial Holmes identified Walker as "Wee Wee" and confirmed that Walker shot her. According to Holmes, Donaldson was with Walker at the time of the shooting.

On March 31, 2008, Delois Persha was shot outside of an upstairs apartment at 242 W Street, N.W., a block north of LeDroit Park, while waiting for Terrill McCray to come to the door. When Persha entered the apartment building, she had seen Walker holding a gun and arguing with a man in the hallway. While waiting

for McCray, Persha told Deandre Swann, who had come out of the apartment, to hurry up because she wasn't "going to let him sit [her] down and shoot [her] like he did that girl Trish [Holmes]." Walker and Swann soon came up the steps while Persha was waiting outside the apartment, and Walker shot her multiple times. Before Walker shot Persha, he said "what you looking at" and "you fuck with me, I'm going to shoot you like I did that bitch Trish. Bitch, I'll kill you." Persha briefly lost consciousness and when she woke up, she was shot two or three more times. In total, Persha was shot six times. While in the hospital in April 2008, Persha identified Walker as the shooter while examining a nine-photo array.

Less than six months later, while Walker was in jail, the police found Persha lying on the sidewalk bleeding. A medical examiner found that Persha died as a result of gunshot wounds to the head and torso. At trial the government introduced letters between Walker and Donaldson that police found while executing search warrants for Walker's jail cell and the homes of Donaldson's parents. The government argued that these letters were coded messages which showed that Walker and Donaldson conspired to shoot Holmes and Persha before they could testify at Walker's trial. The government also introduced calls Walker made while in jail that referred to Donaldson.

## C. Jolanta Little

On September 27, 2008, Jolanta[2] Little was arrested for an unrelated carjacking and interviewed by detectives. Little confessed to the carjacking and subsequently told other detectives that he saw Donaldson shoot and kill Persha. During that videotaped interview, Little identified a photograph of Donaldson and a photograph of the type of gun used by Donaldson, described characteristics of the gun used by Donaldson, and marked on maps to show where the shooting took place. The detectives also spoke to Little about the theory that Walker arranged Persha's murder and Little responded with information about the friendship of Walker and Donaldson.

Little entered into a plea deal and signed a cooperation agreement with the government. When he testified before a grand jury on November 26, 2008, Little confirmed that he had reviewed the videotape of the September 27 interview and

---

[2] Little's name is spelled "Jolante" in court records and in the caption of his own appeal to this court (Nos. 10-CF-765, 13-CO-481). However, Little spelled his first name "Jolanta" during the videotaped questioning by detectives and it is spelled that way in the transcript of that interview.

wanted to incorporate that recording into his grand jury testimony.[3] However, when the grand jury reconvened on December 11, 2008, Little testified that what he told the detectives in September was not the truth but was based on rumors he had heard. Little said that he lied to the detectives to get out of jail, and put Donaldson in jail instead, because he had heard a rumor that Donaldson was trying to rob him.[4]

At a pretrial deposition over which the trial court presided on January 14-15, 2014, Little testified that he was the person who killed Persha. At the time of this deposition, Little also stated that he had been granted immunity and believed he could not be prosecuted for Persha's murder. At trial Little testified again that he had killed Persha and asserted that he did not know where Donaldson was when he did so. A large portion of the videotape of Little's interview with detectives in September 2008 was played before the jury at trial.

**D. This Court's Decision in *Little***

[3] The grand jury proceedings resumed on a second day so that the jurors could watch the remaining portions of the videotape of Little's interview.

[4] Little also testified at trial and in his pretrial deposition that, in a meeting prior to the grand jury testimony, he told his lawyer and the prosecutor that what he said in the interview was not the truth.

After appellants' trial was over, this court reversed Little's convictions, holding that his confession to the carjacking should have been suppressed. *Little v. United States*, 125 A.3d 1119, 1122 (D.C. 2015). Looking at the totality of the circumstances and focusing on the detectives' statements to Little about possible sexual assault in jail and the police pursuing other charges against Little for crimes they did not truly suspect him of committing, we concluded that Little's ultimate confession to the carjacking on September 27, 2008, was coerced. *Id.* at 1127-28. This court commented that a negotiation was taking place during the interrogation and that one of the detectives was trying to get Little to confess and "work out a deal" once he put "some meat . . . on the table." *Id.* at 1129. The court remanded the case for a new trial from which Little's confession to the carjacking would be excluded because "the combination of the timing and the nature and intensity" of the detectives' tactics led to the conclusion that the confession was not voluntary. *Id.* at 1133.

Soon after Little confessed to the carjacking, he spoke to homicide detectives. This court did not address whether Little's subsequent statements implicating Donaldson in the 2008 murder were involuntary, but merely referred to

these later statements in a footnote. *Id.* at 1130 n.10 (referring to the police "questioning [Little] about other crimes he witnessed or knew about").

## E. The Issues On Appeal

Appellants timely appealed their convictions and also filed motions for a new trial, which the trial court denied. Portions of the videotape of Little's interviews with the carjacking and homicide detectives were played for the jury at the trial in 2014, prior to our ruling in *Little*. Appellants now assert that their constitutional rights were violated because Little's statements implicating Donaldson and Walker are the tainted fruit of Little's coerced confession to the carjacking. As a result, they contend, the government has the burden to show that Little's statements about the murder were free of taint. The government responds that it is appellants' burden to show that Little's later statements about the murder were coerced *and unreliable*.

Appellant Walker has also presented other issues, such as the trial court's denial of a pretrial hearing to determine the reliability of identification testimony by Holmes, the trial court's decision not to determine prior to trial whether the government had sufficient evidence that he was a member of a criminal street

gang, and the trial court's admission of evidence as statements of co-conspirators. Appellant Donaldson also contends that the trial court admitted evidence that was the poisoned fruit of Little's involuntary statement.

## II. Little's Testimony at Trial

### A. Additional Background

In February 2012 Walker's counsel filed a motion to exclude testimony by cooperating witnesses and requested a reliability hearing. His theory seemed to be that the testimony of any witness cooperating with the government is inherently (or at least presumptively) unreliable. Nowhere in this boilerplate motion does counsel specifically mention Little, nor does counsel move to suppress Little's prior statements (or his anticipated testimony) by alleging that they were coerced. It appears that Donaldson's counsel joined this motion.

During a January 23, 2014, pretrial hearing which occurred after Little's pretrial deposition, the trial judge asked defense counsel if they were still pursuing the motion to exclude testimony by cooperating witnesses. Counsel for both appellants responded separately saying "no" and "I don't believe we have a

realistic basis for pursuing it." Appellants' counsel received the transcript of Little's interview approximately a year before trial, which began on January 27, 2014, and seemed to have had the videotape at least as early as July 2013. Therefore, a reasonably diligent attorney who thought such a claim was well-founded would have been able to file and litigate a motion to exclude Little's testimony on the ground that it was involuntary.

Nevertheless, when Walker and Donaldson moved for a new trial, claiming that Little's statements implicating them were involuntary, the government did not assert that appellants had waived this issue by failing to raise it prior to trial.

## B. Standard of Review

Under the rules of criminal procedure, motions to suppress evidence must be made before trial. Super. Ct. R. Crim. P. 12 (b)(3) (2014); *see also* D.C. Code § 23-104 (a)(2) ("A motion . . . to suppress evidence shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion."). Moreover, "[f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof, but the Court for cause shown may grant relief from the waiver." Super.

Ct. R. Crim. P. 12 (d) (2014). Moving to suppress on one ground does not preserve a claim that the evidence should have been suppressed on a different ground. *Lowery v. United States*, 3 A.3d 1169, 1177 (D.C. 2010) (motion to suppress statement on Fifth Amendment grounds did not preserve argument that statement should have been suppressed on Fourth Amendment grounds); *Artis v. United States*, 802 A.2d 959, 965 & n.5 (D.C. 2002); *see also United States v. Schwartz*, 535 F.2d 160, 163 (2d Cir. 1976) ("[T]he failure to assert a particular ground in a pre-trial suppression motion operates as a waiver of the right to challenge the subsequent admission of evidence on that ground.").

The Supreme Court and the D.C. Circuit have explained the difference between "forfeiture" and "waiver."

> When an error is forfeited, it is not 'extinguish[ed]' but instead is subject to review under the plain error standard of Rule 52 (b). When an error is waived, on the other hand, it is extinguished; the result is that there is no error at all and an appellate court is without authority to reverse a conviction on that basis.

*United States v. Weathers*, 186 F.3d 948, 955 (D.C. Cir. 1999) (alteration in original) (internal citations omitted) (citing *United States v. Olano*, 507 U.S. 725, 733-34 (1993)). The D.C. Circuit analyzed *Olano* and *Davis* and came to the

conclusion that untimely objections which are within the scope of Rule 12 are considered to be waived and cannot be revived on appeal. *Weathers*, 186 F.3d at 957 (citing *Davis v. United States*, 411 U.S. 233 (1973)).

The government claims that appellants waived the issues surrounding Little's prior statements because they did not move to suppress those statements on the ground they are now presenting to this court. Appellants respond that the government waived its waiver defense. We need not decide whether the government "waived the waiver" because even if appellants did not waive their claim that Little's statements were involuntary, they forfeited it. Consequently, at best for appellants, the plain error standard would apply.

"Under the test for plain error, appellant first must show (1) 'error', (2) that is 'plain', and (3) that affected appellant's 'substantial rights.' Even if all three of these conditions are met, this court will not reverse unless (4) 'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Lowery*, 3 A.3d at 1173 (citing *In re D.B.*, 947 A.2d 443, 450 (D.C. 2008) (quoting *Thomas v. United States*, 914 A.2d 1, 8 (D.C. 2006))). This "'is and should be, a formidable'" burden. *Lowery*, 3 A.3d at 1173 (citing *Comford v. United States,* 947 A.2d 1181, 1189 (D.C. 2008) (quoting *(Kevin) Hunter v. United*

*States,* 606 A.2d 139, 144 (D.C. 1992)). In a case like this it is important to take the burdens of plain error review seriously because appellants' decision not to pursue the exclusion of Little's testimony and prior statements may have been based on a strategic assessment that it would be more advantageous for Little to testify, consistently with his deposition, that he, not Donaldson, killed Persha.

The appellant bears the burden on each of the four prongs of the plain error standard. *Id.* Assuming that appellate review is not precluded by the waiver provisions of Rule 12, appellants' arguments are governed by the plain error standard of review. For the reasons explained below, appellants cannot satisfy this demanding standard.

## C. Appellants Have Not Met Their Burden on Plain Error Review

To satisfy the first and second prongs of the plain error test, there must be error which is "plain" (meaning "clear" or "obvious"). *Thomas v. United States*, 914 A.2d 1, 20 (D.C. 2006) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). We cannot say that an error is "plain" when neither this court nor the Supreme Court has decided the issue. *Euceda v. United States*, 66 A.3d 994, 1012 (D.C. 2013). Here, appellants have failed to demonstrate [even post-*Little*] that

there was error or that it was "obvious." Since appellant has failed to satisfy the first two requirements, we need not discuss prongs three and four of the plain error test.

There is a fundamental difference between excluding a defendant's own statement on the ground that it was involuntary and seeking to exclude the statement of a witness. In the latter situation the Fifth Amendment protection against self-incrimination does not apply. *Dowtin v. United States*, 999 A.2d 903, 909-10 (D.C. 2010) (recognizing that a defendant "lacks standing to challenge an asserted violation of his co-defendant's Fifth Amendment right against compulsory self-incrimination" where defendant was challenging the admissibility of a videotaped police interview of his co-defendant); *Douglas v. Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003) (holding that the defendant did not have standing to challenge a violation of a witness's rights and recognizing that the issue of taint is analyzed differently when a coerced statement was given by a witness, rather than by the defendant). Neither the Supreme Court nor this court has recognized a defendant's right to exclude the testimony of a witness on the ground that it was involuntary or coerced.

Perhaps more to the point, nothing in *Little*[5] compels the trial court to exclude testimony on these grounds. Appellants acknowledge that this court has not addressed whether the admission of an involuntary witness statement violates a defendant's due process rights. In this situation, appellants cannot establish plain error. Even if we were to recognize such a right, appellants have not established that Little's statements about the murder were involuntary, much less false or unreliable, or that the police conduct which elicited those statements was intolerably coercive. Because this issue was not properly preserved and appellants have not met the plain error standard, we need not address this important but complicated constitutional question.[6]

---

[5] Appellants also argue that our decision in *Little* constitutes newly discovered evidence under Criminal Rule 33. This court has not considered appellate court opinions to be "evidence" for purposes of seeking a new trial. Appellants' proposition that evidence of the involuntariness of Little's statements could not have been discovered in advance of Walker and Donaldson's trial is incorrect. As discussed above, appellants could have timely moved to suppress Little's statements based on involuntariness. The fact that the judge presiding over Little's trial had already deemed his confession voluntary does not excuse appellants' failure to seek exclusion from their own trial.

[6] Some courts recognize a defendant's right to challenge involuntary witness statements on due process grounds, but they require a showing that the witness testimony is false or unreliable or that there was extreme government misconduct. For example, the Seventh, Ninth, and Tenth Circuits have acknowledged this right in certain circumstances. *See*, *e.g.*, *United States v. Thomas*, 794 F.3d 705, 708 (7th Cir. 2015) ("If the statement made by [the witness] was coerced and demonstrably unreliable, and its admission in evidence . . . could not be found to be a harmless error, the defendants would be entitled to a

(continued…)

## D. Playing the Videotape

Appellants argue a separate evidentiary issue -- that too much of the videotape of Little's prior statement was played to the jury. In reviewing the trial

_____

(…continued)

new trial."); *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) ("[Appellant] is entitled to habeas relief if the trial court's admission of [the witness's allegedly coerced] testimony rendered the trial so fundamentally unfair as to violate due process."); *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) ("[D]efendants' due process rights would be implicated if the subject witness was coerced into making *false* statements and those statements were admitted against defendants at trial.") (emphasis in original); *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984) ("Due process is implicated when the government seeks a conviction through use of evidence obtained by extreme coercion or torture."). Where courts have recognized this right, the burden has been on the defendant. *See*, *e.g., Douglas v. Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003) (the defendant must show that the witness's trial testimony was involuntary); *People v. Badgett*, 895 P.2d 877, 887 (Cal. 1995) ("[W]hen a defendant makes a motion to exclude coerced testimony of a third party on due process grounds, the burden of proving improper coercion is upon the defendant.").

On the other hand, some courts do not recognize such a right. *See*, *e.g., Harris v. White*, 745 F.2d 523, 524 (8th Cir. 1984) (defendant seeking habeas relief did not have right to a hearing outside the presence of the jury to determine whether rape victim "had been threatened or coerced by the prosecution to testify"); *id*. at 524 n.2 (noting that *LaFrance v. Bohlinger*, 499 F.2d 29 (1st Cir. 1974), a case on which Donaldson relies, "does not establish a general rule that witnesses' statements must be voluntary."); *State v. Vargas*, 420 A.2d 809, 814 (R.I. 1980) (defendant not entitled to hearing to determine voluntariness of witness statement used to impeach because "the individual alleging the deprivation must be the one whose rights have been violated by the unlawful governmental conduct, not a defendant claiming to be aggrieved by introduction of damaging evidence.").

transcript, it is clear that defendants' counsel were requesting that the government be required to impeach Little answer by answer with clips from the videotape – to proceed, as the trial judge confirmed, "[s]entence by sentence through this long interview." In order for the government to effectively discredit Little's current testimony that he had shot Peaches and had only been repeating rumors when he implicated Donaldson, it was important to demonstrate that Little previously had explained in detail how Donaldson had shot her. Therefore, the court allowed the government to play for the jury the tape of Little's interview with the homicide detectives, which lasted a little over an hour.[7] The judge and the government gave defense counsel opportunity to argue that certain segments of this video should be excluded, but counsel did not identify any.

A trial judge "has the responsibility of managing the conduct of a trial." *Greenwood v. United States,* 659 A.2d 825, 828 (D.C. 1995) (quoting *Williams v. United States,* 228 A.2d 846, 848 (D.C. 1967) ("a trial judge has the responsibility of moving a trial along in an orderly and efficient manner")). These types of decisions are reviewed for an abuse of discretion. *Greenwood,* 659 A.2d at 826.

---

[7] Because Little adopted his prior statements to the detectives during his sworn grand jury testimony, this segment of the videotape was admitted at trial as substantive evidence, not just to impeach credibility. *See Koonce v. United States*, 993 A.2d 544, 552-53 (D.C. 2010) (citing D.C. Code § 14-102 (b)).

The portion of the videotape of the September 2008 interview in which Little spoke with the homicide detectives was a little over an hour long. It was within the trial judge's discretion to have the government conduct the questioning of Little and then play relevant portions of the videotape in an efficient manner.

## III.    Other Issues Raised By Appellants

Appellant Walker presents numerous other claims of error in the conduct of his trial. Many of these arguments are predicated on the assumption that Little's statements about the murder were involuntary, an issue that has not been preserved. These claims have other defects as well. Appellant Donaldson asserts that various items of evidence were "fruit of the poisonous tree."

### A. Holmes's Identifications

Walker argues that the trial court erred by not holding a suppression hearing before admitting identification testimony by Holmes. He asserts that the identification procedures were unduly suggestive and that her out-of-court and in-court identifications were unreliable. In reviewing the denial of a motion to suppress identification, this court gives deference to the trial court's findings of

fact and reviews its legal conclusions *de novo*. *Castellon v. United States*, 864 A.2d 141, 148 (D.C. 2004). Because they determine the issue of admissibility, suggestivity and reliability are mixed questions of law and fact. *United States v. Brown,* 700 A.2d 760, 762 (D.C. 1997).

Out-of-court identifications are addressed in a two-step inquiry: "whether the 'identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification,' and if so . . . whether the identification is nonetheless sufficiently reliable." *Lyons v. United States*, 833 A.2d 481, 486 (D.C. 2003) (quoting *Turner v. United States*, 622 A.2d 667, 672 n.4 (D.C. 1993)). "A trial judge ruling on a motion to suppress an out-of-court identification must make an express 'yes or no' determination on the question whether the procedure was impermissibly suggestive." *Long v. United States*, 156 A.3d 698, 707 (D.C. 2017). But even if the procedures were "impermissibly suggestive," the evidence will not be suppressed if the government can show that the identification was reliable. *Maddox v. United States*, 745 A.2d 284, 291-92 (D.C. 2000); *see also Greenwood*, 659 A.2d at 828.

Even when there has been a first-step finding that the procedures were not unduly suggestive, we encourage trial courts to make explicit reliability findings.

*Greenwood*, 659 A.2d at 828. "We have done so because, in that occasional case where we disagree with the no-suggestivity finding, or where that finding presents a close question, the appeal can be resolved based on the outcome of the reliability determination without the need to remand for findings on that point." *Id.; see also Williams v. United States*, 696 A.2d 1085, 1086 (D.C. 1997) ("We strongly suggest once more that if the identification process is called into question the trial court should rule on both aspects of the inquiry as a matter of course.").

At a pretrial conference, Judge Johnson denied the motion to suppress, subject to a later ruling on the reliability of the identification. After hearing the trial testimony, he found that the identification was "entirely reliable based upon the fact that [Holmes] had known [Walker] for many years, [and] had interactions with him around the neighborhood." The court also asked Walker's counsel if it needed to make any further findings, and counsel responded "no."

There were no express findings on the issue of suggestivity as required by our case law.[8]  However, even if the identifications were unduly suggestive, the

---

[8]  It is likely that the trial judge implicitly found no impermissible suggestivity but announced that he would make a later finding on reliability because, as explained above, we have encouraged trial judges to make both findings. We have seen no evidence of undue suggestivity in the record. The nine

(continued…)

trial court did not err in finding that Holmes's out-of-court and in-court identifications were reliable. That finding is firmly supported both legally and factually given Holmes's identification of Walker by his nickname immediately after the shooting, her familiarity with Walker and his family for years, her history of buying drugs from Walker, and her previous face-to-face encounters with Walker. We do not see a basis to disturb the trial court's decision to admit this evidence of identification.

## B. Fruits of Little's Statements

Donaldson argues that the letters between Walker and Donaldson and the recordings of Walker's calls from jail should have been excluded because they were the tainted fruits of Little's coerced statements. Although Little did not point them to this evidence, Donaldson's theory seems to be that, but for Little's statements to the homicide detectives, the police would not have obtained search

---

(…continued)
photographs shown to Holmes all portray black males with similar characteristics: age, complexion, hair length and style, etc. As to Holmes's identification of Walker from a book containing photographs of approximately 50 different people, we have not been provided with this book nor has Walker provided any evidence of impermissible suggestivity in this identification procedure. In any event, the law is clear that an identification is admissible if it is reliable, even if there has been a finding of suggestivity.

warrants for the homes of Donaldson's parents and Walker's jail cell, and the letters would not have been found. In addition, appellant supposes, the government would not have had reason to review Walker's calls from jail.

Donaldson relies primarily on the seminal case of *Wong Sun v. United States*, 371 U.S. 471 (1963), arguing that the letters and calls should not have been admitted against Donaldson because they would not have been found except by exploitation of Little's coerced statement. Although appellant asserts that "the *Wong Sun* case is exactly on point[,]" a close reading reveals that it undercuts his argument.

*Wong Sun* involved three individuals who were charged with various narcotics offenses. Following an unlawful arrest, Toy told police that Yee had drugs. *Wong Sun*, 371 U.S. at 474-75, 487. When officers found heroin at Yee's home, he told them that he got the drugs from Toy and Wong Sun. *Id.* at 475. The government introduced the drugs against Toy and Wong Sun. *Id.* at 477. The Supreme Court held that, because the heroin would not have been found except by "exploitation" of Toy's illegally obtained statements, it should have been suppressed as to Toy. *Id.* at 487-88. However, the Court's holding "that this ounce of heroin was inadmissible against Toy [did] not compel a like result with

respect to Wong Sun." *Id.* at 491-92. Wong Sun was not entitled to suppression because the seizure of heroin from Yee "invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial." *Id.* at 492. Following Wong Sun's reasoning, the "fruits" Donaldson identifies -- the letters and calls -- could only be suppressed as to Little, not Walker or Donaldson.

In making these arguments for suppressing fruits, appellant relies uncritically on cases where the statement in question was taken from the defendant. He does not cite any cases where the exclusionary rule has been extended to suppress fruits after the police obtained a statement by violating a third party's rights. Indeed, at least where the Fourth Amendment is concerned, the law is to the contrary. *See United States v. Payner*, 447 U.S. 727, 734-738 (1980) (holding that a federal court's supervisory power does not extend to suppressing evidence obtained by exploiting a violation of a third party's constitutional rights); *id.* at 737 n.9 (rejecting Fifth Amendment Due Process claim because "the fact remains that the limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant*") (emphasis in original) (internal quotation marks omitted); *Mayes v. United States*, 653 A.2d 856, 865-66 (D.C. 1995) (discussing and applying *Payner*); *United States v. Johnson*, 496 A.2d 592, 595 (D.C. 1985) ("a movant must show that his own

fourth amendment rights have been violated" in order to exclude evidence as fruit of the illegality); *see also People v. Jenkins*, 997 P.2d 1044, 1090 (Cal. 2000) ("a defendant may not prevail [in excluding physical evidence] simply by alleging that the challenged evidence was the fruit of an assertedly involuntary statement of a third person").

In sum, appellants have not established that they have due process rights to challenge Little's testimony on the grounds that it was the product of his coerced statement. Moreover, this court and the Supreme Court have not extended the exclusionary rule to suppress the fruits of a statement taken in violation of a third party's rights. Thus, we reject Donaldson's argument that the fruits of Little's statement should have been suppressed.

## C. The Letters Between Walker and Donaldson

As mentioned above, the government sought to introduce letters between Walker and Donaldson that police found while executing search warrants for Walker's jail cell and the homes of Donaldson's parents. The government argued that these letters were coded messages which showed that Walker and Donaldson conspired to shoot Holmes and Persha before they could testify at Walker's trial.

Statements of co-conspirators made during the course of, and in furtherance of, the conspiracy are admissible against all members of the conspiracy. *Harrison v. United States*, 76 A.3d 826, 834 (D.C. 2013). A trial court is not required to rule on the admissibility of co-conspirator statements prior to trial, but can and normally should make this ruling during the prosecution's evidence. *Butler v. United States,* 481 A.2d 431, 439-41 (D.C. 1984). "[T]he existence of the conspiracy must be proved to be more likely than not." *Id.* at 441 (internal quotation marks omitted). This court reviews the admission of a co-conspirator statement for abuse of discretion. *Holiday v. United States*, 683 A.2d 61, 86 (D.C. 1996).

After thirteen days of trial, the court specifically considered whether the government had established the existence of a conspiracy and did so without relying on the hearsay statements in the letters themselves. Using a "more likely than not" standard, Judge Johnson determined that "there was clearly a conspiracy." He based this finding on evidence about the shootings of Persha and Holmes, the close relationship between the defendants, the motive to eliminate both witnesses before they could testify at Walker's upcoming trial, and the communications between Walker and Donaldson "via telephone and via friends

communicating with other friends." He then permitted the letters to be introduced as co-conspirator statements.

Walker does not argue that there was insufficient evidence to support this ruling. He asserts instead that "if Mr. Little's coerced statements, Ms. Holmes's prior identification testimony, and Ms. Persha's prior statements had been properly excluded, the trial court would not have had sufficient evidence to find the existence of a conspiracy was more likely than not." In making this claim, he cross-references two arguments we have already rejected and alludes to one he has not briefed.[9] It is not clear to us that Donaldson is making a similar argument, but

---

[9] Persha was not able to testify at trial because she had been killed. The trial court found that appellants had procured her unavailability and admitted audiotapes and transcripts of her grand jury testimony. *See Devonshire v. United States*, 691 A.2d 165, 168-69 (D.C. 1997) (a defendant who procures the unavailability of a witness forfeits his rights to confrontation and to object to the admission of hearsay); *see also Giles v. California*, 554 U.S. 353, 367-68 (2008) (principle of forfeiture by wrongdoing applies when the defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness") (quoting Fed. R. Evid. 804 (b)(6)); *(Emanuel) Jenkins v. United States*, 80 A.3d 978, 994-95 (D.C. 2013) ("if the defendant conspired with another to prevent the witness from testifying, forfeiture ensues whether it was the defendant himself or another co-conspirator who made the witness unavailable"). Walker has not briefed any argument that Persha's statements were improperly admitted.

even if he is, appellants have not established that the letters should have been excluded.[10]

## D. Street Gang Charges

The indictment included numerous counts charging Walker and Donaldson with committing a specified felony "for the benefit of, at the direction of, and in association with any other member or participant of [the LeDroit Park] criminal street gang," in violation of D.C. Code § 22-951 (b)(1) (2007).[11] Walker asserts that the prosecution used these charges "to impermissibly circumvent" the restrictions on "other crimes" evidence found in *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964). More specifically, he argues that the trial court abused its

---

[10] Even if the letters were not admissible as co-conspirator statements, each one would have been admissible against the declarant as a statement of a party opponent. Moreover, "[s]tatements between alleged coconspirators can be relevant wholly apart from their truth or falsity because the very act of plotting is itself compelling proof of the existence of the conspiracy." *Jenkins*, 80 A.3d at 993. "For this purpose, the veracity of the plotters' assertions is not the point; rather, the statements are non-hearsay verbal acts that manifest the conspiratorial agreement." *Id*.

[11] A criminal street gang is defined as "an association or group of 6 or more persons that [h]as as a condition of membership or continued membership, the committing of or actively participating in committing a crime of violence . . . or [h]as as one of its purposes or frequent activities, the violation of the criminal laws of the District, or the United States . . . ." D.C. Code § 22-951 (e)(1) (2007).

discretion by failing to determine prior to trial whether there was sufficient evidence of a criminal street gang. His motion requesting such a determination seemed to contemplate that the court could, in a pretrial ruling, eliminate certain counts from the trial for lack of evidence.

Walker cites no case requiring such a pretrial hearing, but he analogizes to other circumstances where the trial court has a gatekeeping role. In particular, he cites the *Butler* decision dealing with the admission of co-conspirator statements. In that case, however, we commented on "the impracticality of the mini-trial necessary to unconditional admission under the preponderance standard," 481 A.2d at 441, and concluded that the trial court should make the admissibility decision during the prosecution's evidence. *Id. See also United States v. Gantt*, 617 F.2d 831, 845 (D.C. Cir. 1980) ("As a practical matter, to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of co-conspirators 'subject to connection.'").

In this setting the pretrial hearing sought by Walker would be especially complex and time-consuming (and in large part misdirected) because the criminal street gang allegations are substantive charges -- aggravated forms of the predicate felony. For example, the government was required to prove that the defendant

murdered Persha for the benefit of a criminal street gang or in association with another person who was a member of or active participant in a criminal street gang. "A crime that *happens* to have been committed by a gang participant falls outside of the statute's reach." *(Joseph) Jenkins v. United States,* 113 A.3d 535, 550 (D.C. 2015) (emphasis in original). In this sense, evidence of gang affiliation and criminal activity is not really an "other" crime. *See*, *e.g.*, *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (Fed. R. Evid. 404 (b) "only applies to truly 'other' crimes and bad acts; it does not apply to 'evidence . . . of an act that is part of the charged offense'") (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).

Of course, there are significant risks involved in admitting such evidence without a hearing conducted prior to trial or outside the presence of the jury. If the government fails to prove (1) that a criminal street gang existed, (2) that the defendant was a member of the gang, or (3) that there was the statutorily required connection between the gang and the predicate offense, the court will be faced with a difficult choice between instructing the jury to disregard the evidence or declaring a mistrial. *See Gantt*, 617 F.2d at 845.

Sensitive to the cost in time and judicial resources, the trial court decided it was not "necessary or appropriate" to have an entirely separate "mini trial" ("but not really a mini") on the criminal street gang charges. Nonetheless, the court did consider at a lengthy pretrial hearing whether to permit various criminal acts to be introduced to prove gang affiliation or as *Drew* or *Johnson*[12] evidence to show motive and context. For instance, the trial judge came to the conclusion that evidence of selling drugs was probative of the connection between Walker and Donaldson and the context of the relationship between them (teenagers) and Holmes and Persha (women in their late forties or fifties). In addition, the trial judge denied a motion to exclude photos of graffiti because this evidence "was probative of the existence of a criminal street gang."

No precedent mandates the type of pretrial hearing that Walker requested, there are good reasons not to require it, and appellant has not identified specific evidence that should have been excluded as irrelevant or unduly prejudicial. Further, appellant has not shown how the trial court abused its discretion in

---

[12] *Johnson v. United States*, 683 A.2d 1087, 1098 (D.C. 1996) (en banc) ("*Drew* does not apply where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.").

deciding that evidence of the street gang's existence and hatred for snitches was intertwined with the evidence of the shootings and murder.

## IV.    Conclusion

Because appellants did not preserve this issue, and have not demonstrated plain error, we have not addressed the complex question of whether (and under what circumstances) a defendant has due process rights to exclude witness testimony on the grounds that it was coerced.   Appellants therefore have not established that they are entitled to a new trial.   Walker's additional claims of reversible error at trial are unsuccessful for the reasons stated above.[13]   The judgments of the Superior Court are

*Affirmed.*

---

[13]  Walker also briefly argues that the trial court's cumulative errors warrant reversal.  *See Foreman v. United States*, 792 A.2d 1043, 1058 (D.C. 2002) ("The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the jury's verdict.") We found no individual error above and, therefore, there was no cumulative error which meets this standard.