*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CF-298

GREGORY RAY SMITH, APPELLANT,

V.

UNITED STATES OF AMERICA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018 CF2 007969)

(Hon. Steven N. Berk, Trial Judge)

(Argued April 26, 2022                    Decided September 29, 2022)

*Dennis M. Hart* for appellant.

*Chimnomnso N. Kalu*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Kathryn Bartz*, and *Tamara Rubb*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Gregory Ray Smith was pulled over by police officers for excessive window tint on the automobile he was driving. When officers approached his car, they saw in the car's center console an unsealed bottle of Rémy Martin V, about one-third full. They asked Smith to exit the car and then proceeded

to search it. Inside the car, officers found a small "otter box"—a "hard plastic case with two latches on it"—which they opened. They found three vials containing PCP inside the otter box. The officers then placed Smith under arrest and, while searching him incident to that arrest, found a fourth vial of PCP on his person. Smith was convicted of one count of possession of liquid PCP, D.C. Code § 48-904.01(d)(2), which he now appeals.

Smith raises two arguments on appeal. First, he argues that police officers violated the Fourth Amendment when they searched his vehicle because the apparent open container of alcohol, though it provided probable cause for Smith's arrest, did not provide police with reason to believe that further evidence of the arrestable offense would be found in the car. *See Arizona v. Gant*, 556 U.S. 332, 335 (2009) (officers may search an automobile incident to arrest when "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle"). We agree, and further agree that the vial found on Smith's person was the fruit of the unlawful search, and thus reverse his conviction. Second, Smith argues that there was insufficient evidence to support his conviction for possession of PCP. We disagree with him on that point, so the government may retry Smith on the possession of PCP charge.

**I.**

At around 5 p.m. one evening, officers from the District's Gun Recovery Unit pulled over a Honda Civic because it appeared to have excessively tinted windows.[1] Smith was the driver and sole occupant of the car. During the traffic stop, officers observed what appeared to be a bottle of alcohol in the car's center console, later identified as Rémy Martin V. The bottle's seal was broken, and by the officers' estimation, it was approximately one-third full.

Smith exited the vehicle at the officers' instruction, and the officers then searched the passenger compartment of the car "to see if there[ were] any other liquor[] bottles[,] beer cans, cups, wine bottles, things of that nature" inside. Officers found a black plastic bag on the front passenger floorboard, and inside of the bag was a "hard plastic case with two latches on it"—usefully described by one witness as an "otter box." An officer opened the otter box and discovered an "eye dropper"

---

[1] Because the trial court chose not to hear testimony at the suppression hearing, see *infra* note 2, we recount the uncontested facts in the filings and in-court representations on the motion to suppress, while filling in some gaps with the undisputed evidence at trial. *See Dozier v. United States*, 220 A.3d 933, 937 n.1 (D.C. 2019) ("In reviewing the trial court's denial of a motion to suppress, we 'can consider all testimony from the suppression hearing and undisputed testimony from the trial.'" (citation omitted)).

and "three glass vials" of "[a]mber like liquid," which—in the officer's opinion—"smelled of PCP." A photograph of the otter box was provided to the trial court at the suppression hearing, and that photograph is appended to this opinion. It shows a small opened box, roughly the length of a dollar bill, with three small vials inside of it. After the recovery of the three vials from the car, Smith was placed under arrest. At that point, one of the officers searched Smith's person and recovered an additional vial, which was made of the same material and had the same cap as the vials from the car, and which "contained a liquid that was similar to the liquid" in the other vials.

Smith was charged with (1) possession with intent to distribute PCP; (2) unlawful possession of liquid PCP; (3) possession of drug paraphernalia (the eye dropper); and (4) possession of an open container of alcohol ("POCA") in a vehicle upon a street. Smith filed a pretrial motion seeking to suppress the PCP vials, arguing that the search of his car violated his Fourth Amendment rights and that the search of his person was a fruit of that illegality. The government countered that because it had probable cause to arrest Smith for POCA before any search, both the search of Smith's vehicle and his person were valid searches incident to his arrest. Notably, the government has never contended that officers had any reason to suspect there was PCP in Smith's car prior to uncovering the vials in the otter box.

The trial court denied Smith's suppression motion.[2] The court found that the initial stop was justified by what appeared to be excessive window tint on Smith's car, and that once officers observed an open liquor bottle in the car, they had probable cause to arrest Smith for POCA.[3] Smith does not dispute those preliminary steps in the court's analysis, but only the analysis that follows. The court then reasoned that, because officers could arrest Smith for POCA, they could search the vehicle for other "accouterments of liquor," such as "mixing jars or small cups, shot glasses, [or] other bottles of liquor." The court also found that the officers "had the right to go into the [black plastic] bag" because it "could have furthered their investigation into the POCA charge." The court never specifically discussed the

---

[2] In considering Smith's motion to suppress, the trial judge—with the consent of the parties—chose to forgo an evidentiary hearing, reasoning that Smith's motion read "more like a motion for sufficiency of the evidence," so that "there is not a factual dispute" and the court could "resolve the motion just on the papers." The government belatedly questioned that approach, noting for the "purpose of appeal," having an "evidentiary . . . record" was advisable, but the court nonetheless ruled without an evidentiary hearing. We agree with the government's sentiment, as suppression issues tend to be fact intensive, and the lack of an evidentiary record here is some impediment to our review (and the trial court's own judgment would likely have been better informed with such a record).

[3] The trial court further suggested that the police could have arrested Smith for that window tint infraction, though the government now concedes that was incorrect because a window tint violation is not an arrestable offense. *See* D.C. Code § 50-2207.02 (providing that violators of the window tint statute "shall be issued a $50 citation" or, in certain circumstances, fined). That error is ultimately inconsequential, however, because there was probable cause to arrest Smith for POCA before any search took place.

further intrusion into the otter box itself, or the extent to which it might have contained any items the officers had reason to look for in the car.

At trial, the government introduced evidence that an officer conducted a "field test" on each of the vials recovered at the scene. Those tests indicated that the liquid in each vial was "possibly" PCP. After that, the officer "remediated" the vials. To do so, the officer transferred a portion of the liquid from each of the four vials into a single vial, resulting in a combined sample that was sent to the laboratory for testing (the remaining liquid was destroyed). Smith did not object when that single, combined vial was admitted into evidence at trial. The government then called an expert witness—a forensic chemist who had analyzed the remediated sample. That witness testified that her analysis had reliably determined that the remediated vial contained a "measurable amount" of PCP. Smith's counsel cross-examined the witness as to whether she could say, based on her testing, that any particular vial of the four vials found at the scene had contained PCP. The expert seemed to agree that she could not know the contents of any particular vial because she had only tested the one remediated vial.

At the conclusion of the evidence, the court read the following instruction to the jury defining the possession element of the possession of PCP charge:

> Possession means to have physical possession or to otherwise exercise control over tangible property. A person may possess property in either of two ways. First, the person may have physical possession of it by holding it in his or her hand or by carrying it in his or her body or person. This is called actual possession. Second, a person may exercise control over property not in his or her physical possession if that person both has the power and the intent at any given time to control the property. This is called constructive possession. Mere presence near something or mere knowledge of its location, however, is not enough to show possession.

After several hours of deliberation, the jury acquitted Smith of all but the possession of PCP charge, on which it convicted him. Smith now appeals that conviction.

## II.

Smith argues that the trial court erred when it did not suppress the four vials recovered by the officers at the scene of his arrest. He also argues that there was insufficient evidence to support his conviction for possession of liquid PCP. We consider each of those arguments in turn.

**A.**

We first consider Smith's argument that the search of his vehicle violated his Fourth Amendment rights, and that the subsequent search of his person was a fruit of that initial illegality.

**1.**

When reviewing a trial court's denial of a motion to suppress, we "view the evidence in the light most favorable to the prevailing party," *Bennett v. United States*, 26 A.3d 745, 751 (D.C. 2011) (citation omitted), which is the government in this case. While we draw all reasonable inferences in favor of upholding the trial court's ruling, we review the trial court's legal conclusions de novo. *Id.*

"A search conducted without a warrant is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *United States v. Taylor*, 49 A.3d 818, 821 (D.C. 2012) (citation and internal quotation marks omitted); *see also Mincey v. Arizona*, 437 U.S. 385, 390 (1978). "Under one such exception," often referred to as a *Gant* search, "police officers may conduct a warrantless search of a vehicle, incident to an arrest, if they have reasonable, articulable suspicion to believe that the vehicle contains evidence of the

offense of arrest." *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc) (citing *Gant*, 556 U.S. at 351). "This standard requires a showing considerably less than preponderance of the evidence but more than a mere hunch or gut feeling." *Taylor*, 49 A.3d at 824 (citations and internal quotation marks omitted). Whether a search is lawful under *Gant* "does not turn on per se rules based solely on the nature of the offense of arrest, however, but rather requires a case-specific inquiry into whether, in the particular circumstances, the police have a reasonable, articulable suspicion that relevant evidence might be found in the specific vehicle at issue." *United States v. Nash & Lewis*, 100 A.3d 157, 161 (D.C. 2014); *see also Taylor*, 49 A.3d at 824-25.

A *Gant* search need not be preceded by an actual arrest. *Lewis*, 147 A.3d at 239-40. Nor must the government prove that the officers had a subjective intent to make an arrest at the time of the search. *Id.* Rather, a *Gant* search is permitted so long as:

> (a) the police have probable cause to arrest the suspect for an offense; (b) the suspect recently occupied a vehicle; (c) the police have reasonable, articulable suspicion to believe that the vehicle contains evidence of the offense; (d) at the time of the search, the police have not released the suspect or issued the suspect a citation for the offense; and (e) the suspect's formal arrest for the offense follows quickly on the heels of the search.

*Id.* There is no question that four of those boxes were checked here, and the only one in dispute is the third requirement: whether officers had reasonable, articulable suspicion that a search of Smith's car would produce additional evidence of POCA.

We have two consolidated cases that are particularly informative in answering that question, both of which concerned searches of vehicles after officers had probable cause to arrest the defendant for POCA: *Nash*, in which we held the search unlawful, and *Lewis*, in which we held it lawful.[4]

In *Nash*, officers saw a man standing "between the driver-side door of a car and the car itself" holding a "red-and-silver can." *Nash & Lewis*, 100 A.3d at 159. Officers approached the man, who ducked back into the car and re-emerged holding a bottle of water. As the officers got closer, they saw the red-and-silver can in the car's center console, at which point one officer recognized it as "an approximately

---

[4] These two cases were once consolidated, though after the division ruled in the consolidated appeals, we granted en banc review in one of them (*Lewis*), vacating the division's ruling in that case without disturbing its ruling on the other (*Nash*). *See Lewis*, 147 A.3d at 238 n.1 (en banc). In our en banc opinion, we further clarified that the division's analysis as to whether there was reasonable, articulable suspicion to justify the search of Lewis' car remained good law. *Id.* at 251 ("The division has already ruled that the police had reasonable, articulable suspicion to believe that [Lewis'] car contained evidence of POCA, and the en banc court left that ruling undisturbed.").

twenty-ounce can of Four Loko," an alcoholic beverage. *Id.* The officers placed Nash under arrest for POCA and then searched the car, finding a handgun inside. *Id.* We held that this search was unlawful under *Gant*, concluding "that the officers did not have reasonable, articulable suspicion to search the car for additional evidence" of POCA. *Id.* at 162. We explained that (1) "[t]here was no evidence that Mr. Nash appeared intoxicated or that the car smelled of alcohol"; (2) "[n]o officer testified to having experience recovering additional evidence of POCA from arrestees' vehicles in comparable circumstances"; (3) "[t]here was no evidence that Four Loko is typically packaged, sold, or consumed in a manner that would suggest that additional cans of Four Loko, or other evidence relevant to POCA, would be in the car"; and (4) there was no evidence that Nash's car contained "multiple occupants" or "multiple bottles of alcohol." *Id.* at 162-63. In short, there was not a reasonable basis to believe that there would be additional evidence of POCA in the car, beyond the Four Loko can itself.

We reached the opposite conclusion in *Lewis*, 100 A.3d at 164. In that case, officers stopped a vehicle with both a driver and a passenger. *Id.* In between them, in the car's center console, officers saw a half-full and "large" bottle of Patrón tequila. *Id.* at 160, 164. Officers then searched the vehicle for additional evidence of POCA, and found a cup that appeared to have some alcohol in it, a handgun, and

what appeared to be a marijuana cigarette. *Id.* At trial, one officer testified that, in his experience, "the majority of times when there is a tequila or liquor type of beverage in a vehicle, they'll be drinking through cups." *Id*. at 160. Another officer testified that "people very rarely drink directly out of Patrón bottles and instead usually use cups." *Id.* Unlike in *Nash*, we found that the officers had reasonable, articulable suspicion that the car would contain additional evidence of POCA because: (1) "[t]he car was occupied by two people"; (2) "the large container of tequila was sitting between them"; and (3) the officers "indicated, based on their experience, that they believed that they would find cups in the car" and "explained the basis for their belief." *Id.* at 164. Relying largely on the officers' testimony, we reasoned that "approving the search in the particular circumstances of Mr. Lewis's case would not 'amount to endorsing a per se rule in [POCA] cases.'" *Id.* (quoting *Taylor*, 49 A.3d at 827).

The critical distinction between the two cases is that in *Nash*, there was no evidence aside from the open container itself that the officers had reason to think there would be other accompaniments of drinking in the car—not even testimony about their own experience. Whereas in *Lewis*, the two officers on the scene testified that they "believed that they would find cups in the car" under the circumstances in that case because "based on their experience . . . people usually use cups to drink

tequila and similar types of hard alcohol." *Nash & Lewis*, 100 A.3d at 164. Here, there was no similar evidence. No officer suggested that their experience led them to expect that additional evidence of POCA would accompany the bottle of Rémy Martin V under these circumstances.[5] That places this case on *Nash*'s side of the ledger as an impermissible search. Also, unlike in *Lewis*, there was no second occupant of the car, no indication of the size of the bottle of Rémy Martin V, and no indication of whether officers would expect one to drink that particular type of liquor straight from a bottle of this unspecified size. For all the suppression record reveals, this was a flask-sized bottle or otherwise one that officers would expect to be for personal consumption and not divvied into cups or other containers.[6]

---

[5] Indeed, the officers seemed to think there was a per se rule that they were entitled to search the vehicle simply because POCA is an arrestable offense, contrary to our repeated admonitions that there is no such per se rule. *See, e.g.*, *Nash & Lewis*, 100 A.3d at 161 (citing *Taylor*, 49 A.3d at 822-28). One officer testified as follows:

> Q. Why did you search the vehicle?
>
> A. Based on the fact that there was an opened container inside the vehicle, it was an arrestable offense. We searched the vehicle to see if there's any other liquor[] bottles[,] beer cans, cups, wine bottles, things of that nature.

[6] It appears the government later introduced photographs of the bottle at trial, but those have not been supplied to this court on appeal. The photographs themselves would not alter our conclusion, however, for even if this was a relatively large liquor bottle, the critical missing component was the lack of any testimony

Admittedly, there is commonsense support for the notion that people tend not to drink liquor directly from the bottle (and perhaps in *Nash* commonsense likewise suggested that people typically drink Four Loko straight from a can). *See id.* (officers' testimony that "people usually use cups to drink tequila and similar types of hard alcohol" reflects "practical common sense"). But even if we assume that some unarticulated commonsense could provide the necessary reasonable, articulable suspicion to search the car for standard-sized "liquor[] bottles[,] beer cans, cups, [or] wine bottles," as the officers indicated they were looking for, that would not justify the officers' intrusion into the otter box, where those items could not possibly have been. The authority to search—whether justified by a warrant, probable cause, or reasonable, articulable suspicion—is limited to those containers where the object of the search might be concealed. *See United States v. Ross*, 456 U.S. 798, 821 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers *in which the weapon might be found*." (emphasis added)). As the Supreme Court has put it, "probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase," *id.* at 824, and "[p]olice with a warrant for a rifle may search only places where rifles

---

suggesting officers would have expected this liquor to be consumed out of cups, rather than directly from the bottle.

might be." *Horton v. California*, 496 U.S. 128, 141 (1990) (citation omitted). The otter box was far too small to hold cups, beer cans, liquor bottles, or wine bottles of any typical size, so even assuming the officers had reason to expect those items might be found in the car, that expectation would not justify their intrusion into the otter box.

The government counters that "to the naked eye," the otter box might have contained small "items such as shot glasses," or "mini liquor bottles." Perhaps so, but the question is not whether something related to alcohol might conceivably have fit into that otter box, but whether the type of items that officers had reasonable, articulable suspicion to search for would fit in it. There may be a commonsense link between liquor and ordinary drinking cups, but we do not think that link extends to an inference that people drink liquor from shot glasses while driving, or that they tend to carry miniature bottles of liquor with them while doing so. If the government is going to rely on the potential not just of ordinary drinking cups being in the car, but of more idiosyncratic shot glasses or shot-sized bottles to justify the intrusion into the otter box, that only heightens the need for evidence that the officers had reason to think such items might be found in the car, and that evidence was lacking here.

In sum, the government did not demonstrate reasonable, articulable suspicion for officers to search Smith's car for additional evidence of POCA. Therefore, the trial court erred in denying Smith's suppression motion as to the three vials found during that automobile search.

**2.**

That brings us to the fourth vial, which was found on Smith's person in the course of arresting him. The analysis as to that vial is a bit different because officers had authority to search Smith's person incident to arrest, even if they had no reason to believe they would find additional evidence of the offense of arrest on his person. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect."). Yet the exclusionary rule may still bar that fourth vial's admission, because officers uncovered it only after the unlawful search uncovered the first three vials, and the exclusionary rule "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, relevant here, 'evidence later discovered and found to be derivative of an illegality.'"

*Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). Evidence in the latter category is often referred to as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

In assessing whether evidence is fruit of the poisonous tree, we ask "whether the evidence in question 'has been come at by exploitation of [the primary] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wilson v. United States*, 102 A.3d 751, 753 (D.C. 2014) (quoting *Wong Sun*, 371 U.S. at 488). It is the government's burden to show that the initial illegality did not taint its subsequent discoveries. *Evans v. United States*, 122 A.3d 876, 885 (D.C. 2015); *see also Barnett v. United States*, 525 A.2d 197, 200 (D.C. 1987) ("[T]he burden is on the government to go forward with evidence that will bring the case within one or more exceptions to the exclusionary rule.").

The government did not invoke any of our exceptions to the exclusionary rule—such as the inevitable discovery, independent source, or attenuation doctrines, *see Strieff*, 579 U.S. at 238 (summarizing these three exceptions)—in the trial court. It makes an argument that sounds in inevitable discovery for the first time on appeal, though even now it does not expressly invoke that doctrine, and its failure to preserve that argument in the trial court would permit us to bypass it. *See Oparaugo v. Watts*,

884 A.2d 63, 75 (D.C. 2005) ("Points not raised and preserved in the trial court will not be considered on appeal, except in exceptional circumstances."). But, for his part, Smith does not argue that the government failed to preserve this argument in the trial court, so one basis upon which we might nonetheless exercise our discretion to address it is that Smith has seemingly "waived the waiver." *Walker v. United States*, 201 A.3d 586, 594 (D.C. 2019); *In re T.L.*, 859 A.2d 1087, 1090-91 n.6 (D.C. 2004) (approving "waiver of the waiver" analysis). We need not decide whether this is a case that warrants us considering an unpreserved argument on the basis that the opposing party has not objected to us doing so, because even assuming that it is, we reject the government's argument on its merits.

The inevitable discovery doctrine "shields illegally obtained evidence from the exclusionary rule if the government can show, by a preponderance of the evidence, that the evidence 'ultimately or inevitably would have been discovered by lawful means.'" *Jones v. United States*, 168 A.3d 703, 717 (D.C. 2017) (quoting *Gore v. United States*, 145 A.3d 540, 548 (D.C. 2016)). "To avail itself of the inevitable-discovery doctrine, the government must prove . . . (1) that the lawful process which would have ended in the inevitable discovery had commenced before the constitutionally invalid seizure, and (2) that there is a 'requisite actuality' that the discovery would have ultimately been made by lawful means." *Id.* (cleaned up).

In its brief, the government argues that "because police had probable cause to arrest [Smith] for POCA, they could also permissibly search his person incident to arrest," and there was "*no suggestion that police would not have arrested [Smith] had they not found PCP in the car.*" (emphasis added). Interpreting that as an inevitable discovery argument, we reject it because the government has not shouldered its burden for us to apply this exception. It instead places the burden on the wrong party. It was not Smith's burden to show he would not have been arrested absent the discovery of the PCP in his car. It was the government's burden to show that it would have arrested and searched him regardless of that illegality. It introduced no evidence to that end, and so we reject any inevitable discovery argument because the government did not show "a 'requisite actuality' that the discovery would have ultimately been made."[7] *Jones*, 168 A.3d at 717.

We conclude that the vial found on Smith's person was the fruit of the unlawful search of his car and, accordingly, that the trial court erred in failing to

---

[7] The government also seems to suggest that the vials that were found in the car are admissible under the inevitable discovery doctrine, because officers would have arrested Smith, searched his person, and then—upon discovery of a vial of PCP on him—they could have searched the car for more evidence of PCP (which surely would have permitted them to look in the otter box). This argument falters for the same reason, which is that the government has not carried its burden of demonstrating that officers would have arrested Smith or searched his person absent discovery of the PCP in the car.

suppress that vial along with the first three.  The government makes no argument that the error was harmless, and so we remand to the trial court with instructions to vacate Smith's conviction for possession of liquid PCP.

**B.**

We must also address Smith's argument that the government failed to present sufficient evidence to convict Smith for possession of liquid PCP.  That is because, in the event the government did not present sufficient evidence, it would be barred from retrying the case.  *See Lockhart v. Nelson*, 488 U.S. 33, 41 (1988).

"In reviewing a claim challenging the sufficiency of the evidence, we must view the evidence in the light most favorable to the government, giving deference to the fact finder's right to weigh the evidence, determine the credibility of the witnesses, and draw inferences from the evidence presented." *Mitchell v. United States*, 985 A.2d 1125, 1133-34 (D.C. 2009) (citation and internal quotation marks omitted).  Because a determination that the government failed to produce sufficient evidence is "treated no differently than . . . a judgment of acquittal at the close of all the evidence" (with all the Double Jeopardy implications of an acquittal), *Lockhart*, 488 U.S. at 41, we must consider all the evidence the trial court would have

considered at that point in the proceedings, even that which we have determined was "improperly admitted" at trial. *Mitchell*, 985 A.2d at 1134-35.

Smith argues that—even taking into account the vials found in his car and on his person—the government's evidence was not sufficient to uphold his conviction for possession of liquid PCP. His argument comes in two parts. First, Smith takes as a premise that he was convicted based only on the vial found on his person, and not the ones found in his car. Second, Smith argues that because the only evidence of the contents of that vial on his person was the remediated vial presented at trial, the jury could not reasonably conclude that the vial on his person actually contained PCP.[8]

We disagree with his argument at its first step. There is no reason to believe that the jury's verdict was based solely on the vial found in Smith's actual possession. The jury instructions explained that possession may be proven via constructive possession—i.e., that he had "the power and the intent at any given time to control the property." This constructive possession instruction, together with the

---

[8] Smith also points out, correctly, that "a positive field test, standing alone, cannot prove beyond a reasonable doubt that the substance was [a controlled substance]." *Duvall v. United States*, 975 A.2d 839, 846 (D.C. 2009) (citation omitted).

facts adduced at trial, permitted jurors to find that Smith possessed the vials that were found inside the otter box in his car. Because the jury could have found that Smith possessed all four vials, and credited the government's evidence that the remediated sample (a mixture of the contents of those four vials) contained a measurable amount of PCP, we conclude there was sufficient evidence that Smith possessed a measurable amount of PCP.[9]

**III.**

We reverse the trial court's suppression ruling, and remand the case with instructions to vacate Smith's conviction for possession of liquid PCP.

*So ordered.*

---

[9] Smith also argues that the trial court abused its discretion by admitting into evidence the single "remediated" vial containing PCP, as well as the government's expert testimony as to the contents of that vial. Smith did not raise those objections at trial, as the government points out, and so these claims are reviewable only for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993) (plain error consists of (1) error, (2) that is "plain," (3) that affects the appellant's "substantial rights," and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings"). It is Smith's burden to demonstrate that he satisfies each prong of the plain error test, *see Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992), yet he has not even made an effort to do so, beyond arguing error. That is reason enough for us to reject these late-breaking arguments.

23

## Appendix

